## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

CEA INDUSTRIES, INC.,                     :
                                          :
    Plaintiff,                        :
                                          :
    v.                                :   C.A. No.: _____
                                          :
10X CAPITAL PARTNERS LLC,                 :
                                          :
    Defendant.                        :
                                          :

## COMPLAINT

CEA Industries, Inc. ("CEA" or the "Company") by and through its undersigned counsel, asserts the following claims against Defendant 10X Capital Partners LLC ("10X") and, in support, alleges as follows:

## NATURE OF THE ACTION

1. Plaintiff CEA seeks a declaration that (i) an oppressively one-sided Asset Management Agreement ("AMA"), thrust upon CEA's August 2025 Board of Directors in a seventy-two hour "take it or leave it" demand by Defendant 10X, is void *ab initio* as unconscionable or, in the alternative, (ii) the AMA's purported liquidated damages provision is an unenforceable penalty. That provision, if interpreted as 10X asserts, would require CEA to immediately pay 10X an accelerated payment of the entire balance of the approximately $100 million of fixed fees for the AMA's entire twenty-year term upon termination of the AMA, regardless of when or why the AMA is terminated, including for reasons permissible under the AMA.

2. CEA is a Nasdaq-listed publicly traded company that owns the world's largest corporate treasury of the BNB digital asset token ("BNB"), the native cryptocurrency of the BNB Chain. The Company operates as a Digital Asset Treasury ("DAT") and holds approximately

40000/1113-53231878v2

515,544 BNB tokens with an implied market value of over $330 million as of May 22, 2026. As a company, CEA is focused on long-term value creation, including through a disciplined digital asset treasury strategy. The Company participates in the BNB ecosystem through its acquisition of BNB, allowing CEA shareholders to indirectly participate in this ecosystem exposure. CEA also operates two other legacy business units, Fat Panda and Surna Cultivation Technologies, which operate outside of the cryptocurrency industry.

3.    This case arises from the AMA between CEA and 10X entered on or around August 5, 2025 (during the formation of CEA's DAT business). As Asset Manager for CEA under the AMA, 10X agreed to act as fiduciary and be responsible for, among other things, managing the purchase, sale and other transactions (such as "staking" the tokens) to earn rewards and yield on the treasury assets for CEA.

4.    10X has utterly failed to perform under the AMA. CEA has analyzed 10X's purported treasury management services and found that 10X has performed no active trading or rebalancing of CEA's treasury whatsoever—the core services it is to perform pursuant to the AMA. 10X instead has been acting merely as an advisor, a service it performs under a separate Strategic Advisor Agreement for which 10X was compensated through initial stock purchase warrants executed just prior to the closing of the private investment in public equity ("PIPE") on August 5, 2025. Instead of managing CEA's DAT, 10X has allowed the DAT simply to sit, with little to no effort to create value for shareholders, while extracting between approximately $400,000 and $690,000 per month in fees depending on treasury assets under management, totaling approximately $4.65 million to date.

5.    Prior to entry into the AMA, 10X served as a Strategic Advisor to CEA pursuant to a Strategic Advisor Agreement dated July 28, 2025 (the "Advisor Agreement"). The Advisor

40000/1113-53231878v2

Agreement provided 10X with "the right to nominate individuals for appointment to the Board of Directors." (Advisor Agreement Section 1.2.) 10X nominated two directors—Hans Thomas and Alexander Monje—to the CEA Board on August 5, 2025, contemporaneous with the execution of the AMA and closing of the PIPE. Disagreements amongst the Parties over the intent and meaning of the AMA arose soon after it was signed. Mr. Monje resigned just weeks after the PIPE transaction closed and the AMA was executed. Mr. Thomas resigned during discussions in March 2026 with CEA around requested amendments to the AMA and subsequently advanced extreme positions regarding the AMA.

6.      Indeed, CEA was identified as the target of the BNB focused DAT strategy on or about July 22, 2025. The AMA was drafted and presented by 10X, which sought to expand its then-current relationship with CEA through the AMA (concurrent with the $500 million PIPE investment) to its financial benefit, as an expiring seventy-two hour "take it or leave it" offer. It was approved by the directors and officers of CEA at that time, the majority of whom were on their way out of CEA and likewise stood to benefit financially from the signing of the AMA (and the 10X's concurrent investment), by on or about July 27, 2025—all within *five* **days**. The transaction was one amongst a flurry of similar expedited offers by investment firms to take over DATs using expedited "take it or leave it" offers.

7.      The end result—the AMA—was as oppressive as the process. Among other things, and by way of example only, the term of the AMA is fixed for twenty years; regardless of when or why terminated (and even if 10X's authority to manage the DAT is removed by a 75% shareholder vote), 10X asserts it is owed a purported liquidated damages equal to the full fees it would have been owed for the full twenty-year term accelerated for an immediately payable up front lump sum; the set monthly fees are extraordinary (a multiple of market standard); whether

3

the AMA is terminated for cause or not for cause was to initially be determined by 10X-appointed directors; and consequential or indirect damages and lost profits are precluded as damages for any breach by 10X, but not for any breach by CEA.  The entire AMA is void as unconscionable.

8. Although the Parties' relationship is less than a year old, the AMA has a twenty-year term.  Thus, the AMA has several provisions for termination (both with and without cause) and other mechanisms that allow CEA to remove 10X as the Asset Manager.  Yet 10X has taken the position that, whether terminated with or without cause, whether termination is permissible under the AMA or not, and regardless of how early in the relationship termination occurs, 10X would be entitled to full payment of all fees it would be owed each year for the entire twenty-year term on an accelerated basis: that is, an approximately $100 million up front "liquidated damages" payment upon termination, for any reason, even if the termination is for cause or otherwise not a breach, but rather entirely permissible under the terms of the AMA.  To put that into context, enforcement of the purported liquidated damages provision would require CEA to pay what amounts to nearly 30% percent of the current value of the BNB treasury and roughly 90% of CEA's market capitalization (approximately $114 million as of May 22, 2026) to terminate the AMA for any reason.  On its face, any such liquidated damages clause is an unenforceable penalty as a matter of law.

9. In addition to certain issues of contract interpretation, this case hinges on fundamental principles of Delaware law concerning the enforceability of various contractual provisions, as well as an entire contract itself.  CEA seeks a declaratory judgment that the AMA in its entirety is unenforceable or, in the alternative, to declare as unenforceable AMA Section 13.

10. Although the AMA contains an arbitration provision, it does not apply here.  The provision expressly notes that it "shall not preclude the Parties from seeking provisional remedies

in aid of arbitration from a court of appropriate jurisdiction," which is later noted to include this Court, and that "[a]ny Party may, without inconsistency with this arbitration provision, apply to any state or federal court sitting in Delaware and seek interim provisional, injunctive or other equitable relief until the arbitration award is rendered or the controversy is otherwise resolved." (AMA § 16(i).)

## PARTIES

11.    CEA is a public Nevada corporation with its headquarters in Colorado.

12.    10X Capital Partners LLC is a private Delaware limited liability company with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000. Plaintiff is a citizen of Nevada and Colorado. 10X is a limited liability company and its citizenship is determined by that of its members. Upon information and belief, the majority member of 10X Capital Partners LLC is 10X Holdings LLC. 10X Holdings LLC is a private Delaware limited liability company. Upon information and belief, the majority member of 10X Holdings LLC is Hans Thomas. Mr. Thomas is a citizen of New York. CEA made a good faith and reasonable attempt to ascertain any additional citizenship attributable to 10X Capital Partners LLC from public filings and documents within CEA's possession. The existence of other members and their residency, citizenship, and domicile is not available and is exclusively in the possession of 10X and its members. Upon information and belief, no member of 10X is a citizen of Nevada or Colorado.

14.    Pursuant to the AMA Section 16(j), both CEA and 10X "irrevocably submit to the exclusive jurisdiction of and consent to service of process and venue in the state and federal courts

in the State of Delaware in any dispute, claim, controversy, action, suit or proceeding between the Parties arising out of this Agreement, which are permitted to be filed or determined in such court."

15.    The Court has personal jurisdiction over the parties.  Under Section 16(j) of the AMA, Defendant 10X agreed to submit to the exclusive personal jurisdiction of Delaware state and federal courts.

16.    Venue is proper because the AMA contains a Delaware choice of venue provision and the parties thereto agreed to waive any objection to improper venue or *forum non conveniens*.

17.    Defendant 10X should reasonably expect its actions to have consequences in the State of Delaware.  The AMA is governed by Delaware law and contains a forum selection clause that designates Delaware courts as the forum for any disputes.

## GENERAL ALLEGATIONS

**I.    10X Positions Itself to Control CEA Through the PIPE and an Asset Management Agreement.**

18.    In July 2025, 10X sought to raise funds for a BNB treasury company.  BNB is the digital asset token originally launched by Binance.com.  YZILabs Management Ltd. ("YZi Labs") is a venture capital partner that supports the BNB ecosystem, and initially supported 10X's plan to create a BNB DAT.  That same month, 10X began putting together a suite of deal documents for potential PIPE targets in order to create a BNB DAT.

19.    On or about July 22, 2025, 10X identified CEA—a publicly traded company that operated both a controlled environment agriculture business as well as a vape product and e-cigarette business line—as its preferred PIPE target to execute a BNB DAT.  To obtain the funds to acquire BNB tokens, 10X and Cantor Fitzgerald (the placement agent) sought to raise $500 million through a PIPE transaction.  In exchange for their investment, the PIPE investors received

6

warrants that were convertible to securities issued by CEA. The proceeds from the PIPE would then be used primarily to purchase BNB tokens to be held in CEA's treasury.

20.     10X was not the placement agent for the transaction. To the extent 10X had any compensable role for its services associated with the PIPE transaction, it was already paid pursuant to the separately executed Securities Purchase Agreement and Advisor Agreement.

21.     Mere days after selecting CEA as the PIPE target, the AMA was drafted and presented by 10X as a "take it or leave it" offer. 10X gave CEA's directors, most of which are no longer on CEA's board, seventy-two hours to either accept all of the AMA's terms as written or the entire proposed PIPE transaction, a $500 million investment (in exchange for separate consideration), would be rescinded.

22.     10X also shared a draft of the AMA with YZi Labs, but, upon information and belief, Mr. Monje and 10X informed YZi Labs that the Agreement was solely between CEA and 10X, and would not be shared with other investors. YZi Labs provided no comments to the Asset Management Agreement's commercial terMs.

23.     On July 28, 2025, CEA and 10X entered into a Securities Purchase Agreement and the Advisor Agreement whereby 10X was compensated for its work both in connection with the PIPE deal and as an advisor to CEA in the form of stock purchase warrants.

24.     On August 5, 2025, CEA and 10X closed the PIPE and executed the AMA. Mr. Thomas signed for 10X. That same day both, Mr. Thomas and Mr. Monje were appointed to CEA's Board of Directors. On August 29, 2025, Mr. Monje resigned from CEA's Board of Directors, only to be replaced by Russell Read, 10X's former Chief Investment Officer. Mr. Read was a 10X director designee but was determined to be an independent board member for Nasdaq purposes. Mr. Read was also appointed to the Strategic Committee.

7

25.     The AMA's terms are markedly one-sided, including, for example, the exorbitant fees, twenty-year term, damages provision, and liquidated damages provision and the circumstances to which 10X asserts it applies.  The parties signed the AMA on August 5, 2025, attached hereto as **Exhibit 1**.  The Schedules to the AMA are attached hereto as **Exhibit 2**.

26.     10X also concealed from CEA an undisclosed deal, the Strategic Services Agreement, it had entered into with YZi Labs entitling YZi Labs to a percentage of 10X's AMA fees.  Upon information and belief, that agreed upon fee split was 20%.  Upon information and belief, YZi Labs was never paid by 10X pursuant to the Strategic Services Agreement.  The Strategic Services Agreement also constrained 10X's ability to modify the fee, term, or termination provisions of the AMA and limited 10X's discretion over the way the BNB treasury could be managed.  Those restrictions and the nondisclosure, as well as 10X's simultaneous installation of its own principals onto CEA's Board of Directors and Strategic Committee, placed 10X's self-interest ahead of CEA's shareholders.

27.     The AMA provides for control of CEA's investment strategy by a Strategic Committee and requires that CEA include Mr. Thomas and Mr. Monje as initial members of that committee.  The Strategic Committee must act by unanimous consent, effectively giving 10X veto power over CEA's investment strategy.  Instead of using their control over the Strategic Committee to benefit CEA's shareholders, 10X, Mr. Thomas, and Mr. Monje abused their positions by, among other things, neglecting to perform their duties as asset managers.  They have since left the Company and the Committee.

28.     After entering the AMA, 10X entrenched its control over CEA by ensuring its own directors were appointed to key positions on CEA's Strategic Committee.  10X, Mr. Thomas, and Mr. Monje forged ahead full steam, enriching themselves to the detriment of CEA.

8

**II.     10X Refused to Renegotiate the Asset Management Agreement.**

29.     On November 26, 2025, the existence of the Strategic Services Agreement and an agreed upon fee-split was first partially disclosed in a public filing by YZi Labs.  The November 2025 filing was the first time the majority of CEA's board, aside from the 10X affiliated directors, learned of the Strategic Services Agreement's existence.  Recognizing that 10X had failed to perform under the AMA and engaged in undisclosed fee splitting, CEA began to explore modifying or terminating the AMA.  CEA's independent directors engaged in efforts to clarify whether the Strategic Services Agreement had, in fact, been terminated by YZi Labs.  For instance, as CEA publicly disclosed on February 4, 2026, its board had "been seeking to renegotiate the AMA with 10X to improve the terms for the benefit of the Company and its stockholders," including with respect to its "fees, term, and termination" but "10X has claimed that the Secret Side Agreement prevents it from renegotiating those terms without the consent of YZi Labs."

30.     In or around that time, CEA's independent directors entered discussions with 10X and then-CEA director Hans Thomas to attempt to negotiate reasonable and market standard arms-length amendments to the AMA's terMs.  In connection with those efforts, CEA's outside consultant benchmarked the AMA against similar asset management agreements and determined that the AMA's terms were on the extreme end of that survey.

31.     CEA's efforts culminated in a proposed amendment to the AMA.  On March 8, 2026, CEA independent director Annemarie Tierney sent a draft of the amended AMA to Mr. Thomas.  The proposed amendment, *inter alia*, established that specific services would be required to be performed by 10X as asset manager, shortened the Agreement's initial term to two years, lowered the management fees to a 0.50% annual base fee and performance fee equal to 15% of the annual net appreciation in treasury net asset value (not to exceed 0.25% of the treasury net

9

asset value), and limited the liquidated damages for termination without cause to the 0.50% base management fee due for the remainder of the two-year term.

32.     10X repeatedly stalled CEA's efforts to achieve a reasonable amendment to the AMA. For weeks after they received Ms. Tierney's draft, Mr. Thomas and Mr. Monje pushed off Ms. Tierney's requests for a response. Although Mr. Thomas, as a member of CEA's board, knew that CEA's advisors had performed their own benchmarking analysis of the AMA, Mr. Thomas refused to provide comments to the Agreement until 10X had conducted its own separate analysis. On March 20, 2026, after requesting more time to return a markup of the amended AMA and assuring Ms. Tierney that 10X's advisors were reviewing the Agreement's terms, Mr. Thomas announced it was "time for [him] to step down" from CEA's board. Mr. Thomas resigned on March 23, 2026, without delivering the promised benchmarking analysis presentation or markup.

33.     On March 24, 2026, Mr. Thomas responded on behalf of 10X to Ms. Tierney's markup claiming that 10X had completed its own benchmarking analysis and that not only were the AMA's terms in line with that of similar asset managers for DATs, but that all of the AMA's terms were valid. About two weeks later, Mr. Thomas provided 10X's cursory, self-interested benchmarking analysis of the AMA, which purportedly found that the Agreement's terms were "not uncommon in the market." Mr. Thomas claimed that five other DATs had "total management fees of 1.75% or more," but did not specify whether those management fees included a portion tied to performance or were tiered based on the assets under management. Mr. Thomas further claimed that three other DATs had asset management agreements with initial terms of twenty years—although he did not specify whether those DATs were comparable or what sample size was used. Finally, Mr. Thomas claimed that the "majority of comparable DATs with AMAs had similar liquidated damages or equivalent termination fee provisions," but did not indicate whether

10

those were solely for termination without cause or what the liquidated damages entailed. Mr. Thomas also failed to provide any details on the sample size of the DAT pool that had been benchmarked by their consultant or the names of the companies that had comparable asset management agreements to the AMA between CEA and 10X for verification.

34.    10X's sole concession was to decrease its management fee by the 20% that YZi Labs had waived by terminating the Strategic Advisor Agreement in December 2025 (and which, upon information and belief, was never paid to YZi Labs), with potential additional decreases only if CEA's treasury assets under management reached higher levels than $500 million, disincentivizing future performance. 10X only applied that 20% offset with effect from March of 2026, not retroactive to August 2025 to address the unconscionable agreement. 10X continues to insist that the AMA's terms must be interpreted in a manner that renders the AMA liquidated damages provision an unenforceable penalty and hinders CEA's ability to protect its value for its shareholders.

35.    CEA also reviewed 10X's purported treasury management services and determined that for the most recent quarter, 10X performed no active trading or rebalancing of CEA's treasury. Instead, 10X's services were mainly that of an advisor—services for which 10X was compensated through the initial stock purchase warrants under the separate Strategic Advisor Agreement.

36.    While attempting to renegotiate the AMA's terms, CEA continued to perform under the Agreement, paying between approximately $400,000 and $690,000 per month for 10X's minimal efforts through April 30, 2026.

**III.    10X Claims That Asset Management Agreement's Liquidated Damages Provision and Fee Design Cement 10X's Control Irrespective of Performance.**

37.    10X interprets the purported liquidated damages provision and the AMA's termination provisions as requiring CEA to pay nearly $100 million in accelerated fees if the AMA

11

is terminated for any reason at all, including for cause. The AMA, however, is governed by Delaware law which holds that if 10X's interpretation of the liquidated damages provision is correct, it is entirely unenforceable.

### 1.    The Liquidated Damages Provision

38.    Under Section 13(a), the AMA "shall continue in full force and effect for a term of twenty (20) years (the 'Term'), unless earlier terminated in accordance with Section 13(c)." Section 13(c) defines circumstances that constitute "cause." It is not, however, the actual section pursuant to which the AMA may be terminated. Instead, that is Section 13(b), which provides for the right to terminate both for cause and without cause:

> This Agreement may be terminated upon at least one hundred twenty (120) days prior written notice to the other Party (A) by the Client at the good faith discretion of the Strategic Committee if the Asset Manager has significantly underperformed according to the Strategic Committee's internal metrics, or (B) by the Asset Manager for any reason. Additionally, this Agreement may be terminated at any time for Cause (i) by the Client upon at least sixty (60) days prior written notice to the Asset Manager and (ii) by the Asset Manager upon at least thirty (30) days prior written notice to the Client (unless stated otherwise below). Each such notice set forth in this Section 13(b) shall be referred to as a "Termination Notice". In the event that either Party asserts a right to terminate this Agreement for Cause, the Parties agree that, as a condition precedent to the effectiveness of any such termination, they shall first attempt in good faith to resolve the dispute through mediation. . . .  If the dispute is not resolved through mediation within such period, either party may pursue any remedies available at law or in equity, including termination of this Agreement for cause.

39.    Section 13(a) goes on to provide a purported "liquidated damages" provision that applies to any termination by CEA "for any reason", including one permissible under Section 13(b):

> If this Agreement is terminated by the Client for any reason during the Term, or if the Asset Manager terminated this Agreement due to a material breach by the Client, the Client shall pay to the Asset Manager, as liquidated damages and not as a penalty, an amount equal to all fees and other compensation that would have accrued to the Asset Manager under this Agreement from the date of termination through the end of the Term, paid

40000/1113-53231878v2

monthly throughout the Term in accordance with the payment provisions herein. The Parties acknowledge and agree that the actual damages in such event would be difficult to ascertain and that this amount represents a reasonable estimate thereof and not a penalty. Upon any termination, all of the Asset Manager's obligations hereunder shall cease, except for those that expressly survive under the terms of this Agreement.

40. This liquidated damages provision functions as a penalty rather than a reasonable assessment of damages. According to 10X, if CEA terminates the AMA at any time for any reason, including as permissible under the AMA, CEA must pay all fees that would have accrued to 10X through the end of the twenty-year term, in a single upfront lump sum payment. Yet any damages from an actual breach are easily calculated (the monthly fee under the AMA is fixed). In the AMA, 10X's fee is defined as "1.75% of Treasury Assets under management during the Term, calculated in a manner customary in the industry." (AMA, Schedule C.) The Agreement also identifies a defined operating budget of $5,000,000 for the first year, reflecting that the parties anticipated and quantified the costs associated with performance. (AMA, Schedule B §2.) Moreover, the services covered—including portfolio management, compliance, reporting, and operational infrastructure—are standardized and recurring in nature, rather than unique or speculative. (AMA, Schedule C.) Based on these predictable fee inputs, defined budgetary assumptions, and recurring cost structure, the damages attributable to an early termination were readily calculable at the time of contracting. In other words, it was reasonably possible to estimate 10X's expected lost profits using known variables such as assets under management, fee percentage, and ongoing operating costs.

41. Moreover, the provision does not reflect a reasonable estimate of 10X's probable damages. For example, it would apply even in the absence of *any damages* where the AMA is terminated for cause or otherwise pursuant to its own permissible terMs. If there were an actual breach, it does not factor in the money 10X would save by not performing any further work in

13

exchange for fees or the time value of money benefit to 10X in accelerating twenty years of payments. Nor, if there were a breach, does it in any way take into account 10X's duty to mitigate or the speculative nature of projecting out twenty years. Instead, 10X claims that Section 13 obligates CEA to pay 10X for the full twenty-year contract amount (on an accelerated basis) for no performance at all, regardless of when or why the AMA is terminated. This is contrary to Delaware law.

42. Likewise, the AMA contains a provision by which a 75% supermajority shareholder vote may revoke 10X's authority to manage the DAT. Should the shareholders vote in this manner, 10X would be unable to continue performance under the AMA. The AMA expressly provides that this would not affect the applicability of the liquidated damages provision. In light of 10X's view that the liquidated damages provision is enforceable if the AMA is terminated for any reason, it appears that 10X is also taking the position that a shareholder vote to revoke its authority would either: (1) not result in the termination of the AMA or (2) any subsequent termination of the AMA after such a shareholder vote would still trigger the purported liquidated damages provision. Further, the AMA provides 10X with an irrevocable power of attorney that only ends upon termination of the agreement or the expiration of the twenty-year term. That term becomes impossible where shareholders act to strip 10X of any authority or control.

### 2. The Termination Provision

43. The termination and liquidated damages provisions further demonstrate the unconscionability of the AMA. In full, Sections 13(b)-(c) state:

> (b) This Agreement may be terminated upon at least one hundred twenty (120) days prior written notice to the other Party (A) by the Client at the good faith discretion of the Strategic Committee if the Asset Manager has significantly underperformed according to the Strategic Committee's internal metrics, or (B) by the Asset Manager for any reason. Additionally,

14

this Agreement may be terminated at any time for Cause (i) by the Client upon at least sixty (60) days prior written notice to the Asset Manager and (ii) by the Asset Manager upon at least thirty (30) days prior written notice to the Client (unless stated otherwise below).  Each such notice set forth in this Section 13(b) shall be referred to as a "Termination Notice".  In the event that either Party asserts a right to terminate this Agreement for Cause, the Parties agree that, as a condition precedent to the effectiveness of any such termination, they shall first attempt in good faith to resolve the dispute through mediation.  Within ten (10) business days following the delivery of written notice of termination for Cause, the Parties shall mutually select a mediator and commence mediation proceedings in Delaware under the then-current rules of the Judicial Arbitration and Mediation Service Inc. (or its successor, if applicable).  If the Parties are unable to agree on a mediator within such period, either Party may request that the mediation organization appoint a mediator.  The Parties shall participate in the mediation in good faith and shall share equally the costs of mediation.  The mediation shall be completed within thirty (30) days of the appointment of the mediator, unless otherwise agreed in writing by the Parties.  If the dispute is not resolved through mediation within such period, either party may pursue any remedies available at law or in equity, including termination of this Agreement for cause."

(c) For the purposes hereof, the term "Cause" means (i) with respect to the Asset Manager, (A)(I) fraud, (II) bad faith resulting in a material breach of this Agreement, or (III) any action or omission constituting gross negligence or willful misconduct in performing its obligations under this Agreement, which in each case of (II) or (III)that results in an adverse effect on the Client that is both material and demonstrable; provided, that the Asset Manager shall have a cure period of fifteen (15) days following notice of an occurrence of (I) or (II) (if such breach, action or omission, as applicable is curable) . . . .

AMA §§ 13(b) – (c).

44.    Thus, even to the extent 10X engaged in self-dealing while Mr. Thomas and Mr. Monje served as board members, CEA cannot terminate 10X "for cause" without first providing 10X an opportunity to cure and without then demonstrating a material and demonstrable adverse effect.  (AMA § 13(c).)  Nor would CEA's exercise of its right to terminate 10X "for cause" be of any moment.  CEA would remain on the hook under the liquidated damages provision.  (AMA § 13(a).)  The interplay between Section 13(a) and 13(c) of the AMA creates a perverse

15

incentive for 10X to materially breach the AMA and then reap the reward of accelerated payment of twenty years of fees when it is terminated as a result.

45.     CEA's right to terminate 10X "without cause" is also one-sided in favor of 10X. Section 13(b) states that "This Agreement may be terminated upon at least one hundred twenty (120) days prior written notice to the other Party (A) by the Client at the good faith discretion of the Strategic Committee if the Asset Manager has significantly underperformed according to the Strategic Committee's internal metrics."  (AMA § 13(b).)  This is contrasted with the procedure for termination "with cause" which can be done "at any time . . . by the Client upon at least sixty (60) days prior written notice to the Asset Manager."  (AMA § 13(b).)

46.     Even more offensively, the AMA itself provides that Mr. Thomas and Mr. Monje serve as the initial members of the very committee that determines whether 10X underperformed. In other words, under the AMA, 10X's own CEO and CLO were initially in charge of determining whether 10X significantly underperformed.  (AMA § 8(b).)

47.     Unsurprisingly, despite receiving the authority to create a Strategic Committee to monitor 10X's performance, neither Mr. Thomas nor Mr. Monje ever proceeded to formally adopt the Strategic Committee's charter or hold official committee meetings, effectively ruling out the possibility of terminating 10X without cause (under 10X's interpretation of Section 13(b)).

**3.     10X's Authority to Manage CEA's Treasury Is Revocable and Terminable By Shareholder Vote**

48.     The AMA entitles shareholders to revoke 10X's authority as asset manager, but shareholders must meet a 75% vote threshold.  (AMA § 3(a).)

49.     Pursuant to AMA Sections 3(a)(i) – (x) and 3(b), 10X has broad powers to manage CEA's BNB treasury.  Among other things, 10X can:

16

- "direct the Chief Investment Officer of [CEA] to enter into transactions and other undertakings that . . . the Asset Manager or any [affiliate of 10X] may deem necessary or advisable to carry out its investment decisions" (Section 3(a)(ii));

- "make allocation decisions in respect of the Treasury Assets" (AMA § 3(a)(iii));

- "direct the Chief Investment Officer of [CEA] to purchase, acquire, hold, invest, reinvest, sell, stake, redeem or dispose of, otherwise trade any assets which constitute or will constitute all or any portion of, the Treasury Assets, and place orders with respect to, and arrange for any of the foregoing" (AMA § 3(a)(iv));

- "execute in the name and on behalf of [CEA], all such documents and take all such other actions which the Asset Manager shall deem requisite, appropriate, or advisable to carry out its duties hereunder" (AMA § 3(a)(ix));

- "take any such other action with respect to property in the Treasury as necessary or desirable to carry out its obligations under this Agreement" (AMA § 3(a)(x)).

50. Moreover, AMA Section 3(b) provides 10X with an irrevocable Power of Attorney:

In furtherance of the authority set forth in paragraph (a) above, the Client hereby irrevocably designates and appoints the Asset Manager as its agent and attorney-in-fact, with full power and authority and without further approval of the Client, in the Client's name, place and stead, as required to (i) negotiate, make, execute, sign, acknowledge, swear to, deliver, record and file any agreements, documents, or instruments which may be considered necessary or desirable by the Asset Manager of an AM affiliate to carry out fully the provisions of this Agreement and (ii) to perform all other acts contemplated by this Agreement or necessary, advisable or convenient to carry out its duties hereunder (subject at all times, however, to each and all of the limitations and stipulation set forth herein and in the Investment Guidelines set forth in Schedule B). Notwithstanding the foregoing and for the avoidance of doubt, this power of attorney set forth in this Section 3(b) shall not permit the Asset Manager or an AM Affiliate to take any action that would cause the Asset Manager to take or have possession or "custody" of any cash, securities, or any other assets of the Client, other than direct withdrawal of the fees due to the Asset Manager in accordance with the terms of this Agreement. Because this limited power of attorney shall be deemed to be coupled with an interest, it shall be irrevocable and survive and not be affected by the Client's (or any of its subsidiaries') insolvency or dissolution. However, this limited power of attorney will become revocable upon the expiration of such interest and therefore, this limited power of attorney will terminate upon termination of this Agreement.

AMA § 3(b).

40000/1113-53231878v2

51.     This broad grant of authority remains subject to the oversight of the shareholders. Pursuant to AMA Section 3(a):

> [10X's] authority shall remain in full force and effect until expressly revoked by a shareholders resolution that is duly adopted by the shareholders of the Client with a vote of at least 75% in accordance with the Client's organization documents and delivered to the Asset Manager.  Such a resolution may also terminate this Agreement and is required for any movement of Treasury Assets outside the digital assets ecosystem.  Any such revocation shall not affect any transactions entered into prior to such revocation or the terms of any liquidated damages.

AMA § 3(a).  Under the plain reading of this provision, 10X's authority to act as an asset manager on behalf of CEA can be terminated by a 75% shareholder vote including a resolution to "terminate this Agreement."  Such a termination of 10X would not be by CEA's management or Board, but at the election of its shareholders.  Yet the AMA expressly provides that any such revocation or termination would not impact the applicability of the liquidated damages provision.  Thus, 10X asserts, even if its authority is revoked by a 75% shareholder vote and its performance of its obligations under the AMA is thus rendered impossible, it still is to be paid its fees under the AMA and, if it is terminated as a result, the liquidated damages provision applies.

## COUNT I

### (Declaratory Judgment That the AMA is Void *Ab Initio* as Unconscionable)

52.     CEA repeats and realleges each and every allegation contained in the foregoing paragraphs 1 through 51 of this Complaint as if fully set forth herein.

53.     CEA is entitled to a declaratory judgment that the AMA is void *ab initio* as unconscionable and ordering all fees paid to 10X under the AMA to be returned to CEA.

54.     Under the Federal Declaratory Judgment Act, federal courts "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.

18

55.    This Court has discretion to order "[f]urther necessary or proper relief based on a declaratory judgment or decree … after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." *Id.* § 2202.

56.    The terms of the AMA are so one-sided as to be oppressive. The AMA includes a fixed twenty-year term; there are substantial imbalances in the parties' obligations as a result of the high fees paid to 10X for minimal services; whether the AMA is terminated for cause or not for cause was to initially be determined by 10X-appointed directors; consequential or indirect damages and lost profits are precluded as damages for any breach by 10X, but not for any breach by CEA; and it includes an unjust penalty—regardless of when or why terminated (and even if removed by a 75% shareholder vote), 10X asserts it is owed a purported liquidated damages equal to the full fees it would have been owed for the full twenty-year term accelerated for an immediately payable up front lump sum.

57.    The AMA is also procedurally unconscionable. CEA was given roughly 72 hours to review the proposed AMA and 10X refused to negotiate over any of its terms, threatening to rescind the entire $500 million PIPE deal if CEA did not agree.

58.    An actual and justiciable controversy exists as to whether the AMA is void *ab initio* as unconscionable. 10X has asserted and continues to assert that AMA's terms are in line with market standards and are valid. As such, a ripe controversy exists.

59.    CEA seeks a declaration that the AMA's one-sided provisions and coercive and expedited period for review render the AMA void *ab initio* as unconscionable.

19

## COUNT II

### (Declaratory Judgment That the Purported Liquidated Damages Provision is an Unenforceable Penalty)

60.     CEA repeats and realleges the allegations contained in paragraphs 1 through 51 of this Complaint as if fully set forth herein.

61.     CEA is entitled to a declaratory judgment that the AMA's purported liquidated damages provision in Section 13(a) is an unenforceable penalty.

62.     Under the Federal Declaratory Judgment Act, federal courts "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.

63.     This Court has discretion to order "[f]urther necessary or proper relief based on a declaratory judgment or decree … after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." *Id.* § 2202.

64.     An actual and justiciable controversy exists concerning the enforceability of the AMA's purported liquidated damages provision, which according to 10X provides that upon termination, even if for cause, "all fees and other compensation that would have accrued … from the date of termination through the end of the Term" are due and payable throughout the Term in accordance with the payment provisions herein."  (AMA § 13(a).)

65.     Under Delaware law, a liquidated damages provision is enforceable only where the damages anticipated at the time of contracting were difficult to ascertain, and the amount stipulated constitutes a reasonable estimate of the damages likely to result from the alleged breach.  Where the damages are excessive, which is to say not a reasonable estimate, then the provision is a penalty and the liquidated damages clause is deemed invalid and void.

20

40000/1113-53231878v2

66.    Section 13(a) as interpreted by 10X fails this standard because it bears no reasonable relation to any anticipated or actual damages that 10X might suffer in the event of termination.

67.    Instead, Section 13(a) would require CEA to pay 10X the entirety of its expected revenue stream for up to twenty years, accelerating two decades of fees irrespective of performance or services provided.   The provision does not attempt to measure 10X's probable loss upon termination, such as transition costs, or any mitigation.   Rather, it compels payment of the full twenty-year revenue stream as if 10X fully performed, irrespective of whether it ceased performing and thereby avoided substantial costs, whether market conditions changed, or whether a successor manager could be retained on market terms.

68.    Section 13(a) would bear no rational relationship to any actual or anticipated damages because it would guarantee 10X full compensation without regard to whether it continued to provide services or suffered any economic loss, thereby untethering the amount recoverable from any measurable harm.

69.    Section 13(a), as interpreted by 10X, therefore operates not as a good-faith estimate of damages, but as a mechanism to secure guaranteed revenue and impose a substantial financial penalty on CEA in the event of termination.

70.    10X has interpreted Section 13(a) to function as a penalty designed to deter termination, rather than to compensate 10X for any estimated loss.

71.    Because such an interpretation would render Section 13(a) an unenforceable penalty, CEA is entitled to a declaration that the provision is void and of no effect.

40000/1113-53231878v2

## **PRAYER FOR RELIEF**

**WHEREFORE**, CEA respectfully requests that this Court enter an Order granting the following relief:

(a)    Granting declaratory relief pursuant to 28 U.S.C. § 2201 *et seq.*, as specified herein, including a declaration that that the Asset Management Agreement is void *ab initio* as unconscionable, or in the alternative, that Section 13(a) is an unenforceable penalty under Delaware law;

(b)    Ordering all fees paid by CEA to 10X under the Asset Management Agreement be returned to CEA;

(c)    Awarding CEA such further relief as the Court may deem just, equitable and proper.

<table>
<tr><td><b>Of Counsel:</b></td><td><b>COLE SCHOTZ P.C.</b></td></tr>
<tr><td>

Stephen D. Palley(*pro hac vice* forthcoming)
Brown Rudnick LLP
601 Thirteenth Street NW Suite 600
Washington, D.C. 20005
(202) 536-1766 (Phone)
spalley@brownrudnick.com

Michael Winograd (*pro hac vice* forthcoming)
Hayden A. Miller (*pro hac vice* forthcoming)
Brown Rudnick LLP
7 Times Square
New York, NY  10036
(212) 209-4800 (Phone)
mwinograd@brownrudnick.com
hmiller@brownrudnick.com

Johanna P. Fay (*pro hac vice* forthcoming)
Brown Rudnick LLP
One Financial Center
Boston, MA  02111
(617) 856-8200 (Phone)
jfay@brownrudnick.com

</td><td>

 */s/ James S. Green, Jr.*
Andrew L. Cole (No. 5712)
James S. Green, Jr. (No. 4406)
Nathaniel J. Klepser (No. 6975)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 652-3131 (Phone)
(302) 652-3117 (Fax)
acole@coleschotz.com
nklepser@coleschotz.com

*Attorneys for Plaintiff,*
*CEA Industries, Inc.*

</td></tr>
</table>

Dated:  May 22, 2024

22