**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CEA INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. . 1:26-cv-00595-JLH |
| | ) | |
| 10X CAPITAL PARTNERS LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT 10X CAPITAL PARTNERS LLC'S**
**OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS**

OF COUNSEL:

Alex Spiro*
Michael E. Swartz*
Jianjian Ye*
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
(212) 849-7000
alexspiro@quinnemanuel.com
michaelswartz@quinnemanuel.com
jianjianye@quinnemanuel.com

* admitted *pro hac vice*

Michael A. Barlow (#3928)
Morgan R. Harrison (#7062)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
500 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com
morganharrison@quinnemanuel.com

*Attorneys for Defendant 10X Capital Partners LLC*

Dated: July 28, 2026

**TABLE OF CONTENTS**

**Page**

NATURE AND STAGE OF THE PROCEEDING....1
SUMMARY OF ARGUMENT....1
STATEMENT OF ALLEGED FACTS....3
I. THE PARTIES....3
II. THE BNB TREASURY TRANSACTION....4
III. CEA AGREES TO THE TERMS OF THE AMA AND PERFORMS UNDER IT....4
IV. CEA SEEKS TO RENEGOTIATE....5
V. CEA FILES THIS LAWSUIT....6
ARGUMENT....6
I. LEGAL STANDARD....6
II. THE COMPLAINT FAILS TO STATE A CLAIM (RULE 12(B)(6)) AND THE LIQUIDATED DAMAGES CLAIM IS NOT RIPE FOR ADJUDICATION (RULE 12(B)(1))....7
A. The AMA is Neither Substantively Nor Procedurally Unconscionable....7
B. CEA's Liquidated Damages Claim Is Not Ripe, And The Liquidated Damages Provision Bears A Relationship To 10X's Anticipated Damages....17
C. Leave To Amend Would Be Futile....20
CONCLUSION....20

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*AcademixDirect, Inc. v. Digital Media Sols., LLC*,
2020 WL 3868302 (Del. Super. Ct. June 26, 2020) ....................9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................6

*Bhaskar S. Palekar, M.D., P.A. v. Batra*,
2010 WL 2501517 (Del. Super. Ct. May 18, 2010) ....................19

*Brazen v. Bell Atlantic Corp.*,
695 A.2d 43 (Del. 1997) ....................10, 14

*Chatham Fin. Corp. v. Milhaus*,
LLC, 807 F. Supp. 3d 373 (D. Del. 2025) ....................9

*Chemours Co. v. DowDuPont Inc.*,
2020 WL 1527783 (Del. Ch. Mar. 30, 2020)....................8

*Churchill v. Star Enters.*,
183 F.3d 184 (3d Cir. 1999)....................1

*Ciser v. Nestle Waters N. Am. Inc.*,
596 F. App'x 157 (3d Cir. 2015) ....................8

*Curay-Cramer v. The Ursuline Academy of Wilmington, Delaware, Inc.*,
450 F.3d 130 (3d Cir. 2006)....................7

*Delaware Bay Surgical Servs., P.C. v. Swier*,
900 A.2d 646 (Del. 2006) ....................19

*Doe v. Delie*,
257 F.3d 309 (3d Cir. 2001)....................6

*FdG Logistics LLC v. A&R Logistics Holdings, Inc.*,
131 A.3d 842 (Del. Ch.), *aff'd sub nom. A & R Logistics Holdings, Inc. v. FdG Logistics LLC*, 148 A.3d 1171 (Del. 2016)....................2, 8, 5

*Foman v. Davis*,
371 U.S. 178 (1962)....................20

*Gen. Cable Corp. v. Scottsdale Indem.*,
2025 WL 2576384 (D. Del. Sept. 5, 2025) ....................17

*James v. Nat'l Fin., LLC*,
132 A.3d 799 (Del. Ch. 2016)....................................................................................14

*JJCK, LLC v. Project Lifesaver Int'l*,
2011 WL 2610371 (D. Del. July 1, 2011) ...................................................................9

*Ketler v. PFPA, LLC*,
132 A.3d 746 (Del. 2016) ..........................................................................................14

*Light v. Davis*,
694 F. Supp. 3d 541 (D. Del. 2023), *aff'd in part*, *vacated in part*, *remanded*,
2024 WL 4144066 (3d Cir. Sept. 11, 2024) ................................................................7

*Meritage Fund LLC v. Bohoho Grp., LLC*,
2025 WL 3854813 (Del. Super. Ct. Dec. 8, 2025) ....................................................10

*Middlesex Mut. Assur. Co. v. Delaware Elec. Signal Co*,
2008 WL 4216145 (Del. Super. Ct. Sept. 11, 2008)...............................................9, 10

*Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Loc. Union No. 66*,
580 F.3d 185 (3d Cir. 2009).......................................................................................17

*Reserves Mgmt., LLC v. Am. Acq. Prop. I, LLC*,
86 A.3d 1119, 2014 WL 823407 (Del. 2014).............................................................2, 8

*Rheault v. Halma Holdings Inc.*,
2023 WL 8005318 (D. Del. Nov. 7, 2023) ...................................................................6

*Ross v. Meagan*,
638 F.2d 646 (3d Cir. 1981).......................................................................................20

*Rummel Klepper & Kahl, LLP v. Delaware River & Bay Auth.*,
2022 WL 29831 (Del. Ch. Jan. 3, 2022)................................................6, 8, 12, 14, 16

*Silver Lake Off. Plaza, LLC v. Lanard & Axilbund, Inc.*,
2014 WL 595378 (Del. Super. Ct. Jan. 17, 2014) ................................................11, 12

*Smart Sand, Inc. v. US Well Servs. LLC*,
2021 WL 2400780 (Del. Super. Ct. June 1, 2021) ......................................................9

*Standard Gen. L.P. v. Charney*,
2017 WL 6498063 (Del. Ch. Dec. 19, 2017), *judgment entered,* (Del. Ch. 2018), and *aff'd*, 195 A.3d 16 (Del. 2018)..........................................10, 11, 12, 15, 19, 20

*Talkdesk, Inc. v. DM Trans, LLC*,
2024 WL 2799307 (Del. Super. Ct. May 31, 2024) .............................................14, 16

*Terrell v. Kiromic Biopharma, Inc.*,
297 A.3d 610 (Del. 2023) ....................15

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012), *aff'd*, 729 F.3d 332 (3d Cir. 2013) ....................18

*Waters v. Delaware Moving & Storage, Inc.*,
300 A.3d 1 (Del. Super. Ct. 2023) ....................7, 15, 16

**Other Authorities**

*BNB crosses the corporate Rubicon in $500m CEA reserve strategy*, CRYPTO NEWS (Aug. 5, 2025), https://crypto.news/bnb-crosses-the-corporate-rubicon-in-500m-cea-reserve-strategy/ ....................2

Federal Rule of Civil Procedure 12(b)....................1

Federal Rule of Civil Procedure 12(b)(1) ....................6, 7

Federal Rule of Civil Procedure 12(b)(6) ....................6, 7

Restatement (Second) of Contracts § 363 (1981) ....................9

*What Is BNB (Binance Coin)?*, FORBES (Mar. 15, 2025), https://www.forbes.com/sites/digital-assets/article/what-is-binance-bnb/ ....................1

*Why Digital Asset Treasury Companies Are Changing U.S. Public Markets*, FORBES (Nov. 13, 2025), https://www.forbes.com/councils/forbesbusinesscouncil/2025/11/13/why-digital-asset-treasury-companies-are-changing-us-public-markets/ ....................2

Defendant 10X Capital Partners LLC ("10X") respectfully submits this opening brief in support of its motion to dismiss (the "Motion") the complaint (D.I. 1, the "Complaint") filed by Plaintiff CEA Industries, Inc. ("CEA") pursuant to Federal Rule of Civil Procedure 12(b).

## NATURE AND STAGE OF THE PROCEEDING

On May 22, 2026, CEA commenced this action, seeking a declaration that (i) the Asset Management Agreement (Compl. Ex. 1, "AMA") between it and 10X is void *ab initio* as unconscionable or, in the alternative, (ii) the AMA's liquidated damages provision is an unenforceable penalty. 10X now seeks dismissal of that Complaint for failure to state a claim upon which relief may be granted and for seeking an improper advisory opinion.

## SUMMARY OF ARGUMENT

CEA's unconscionability allegation reflects nothing more than an effort by a successor board of directors to retrade a deal negotiated by their predecessors. But buyer's remorse over a fully negotiated deal between sophisticated parties, represented by counsel, is not a basis for declaring an arms-length contract void. CEA's allegations boil down to a collection of grievances raised following 10X's full performance, which CEA has acknowledged and accepted, under the AMA it entered into regarding 10X's management of a digital asset treasury ("DAT") for BNB. CEA's Complaint should be dismissed with prejudice.

BNB (formally known as Binance coin)[1] is the native cryptocurrency of the BNB Chain, a blockchain ecosystem.[2] A DAT is a mechanism through which a public company can raise capital

---

[1] *See What Is BNB (Binance Coin)?*, FORBES (Mar. 15, 2025), https://www.forbes.com/sites/digital-assets/article/what-is-binance-bnb/.

[2] On a motion to dismiss, a court may consider "matters of public record." *Churchill v. Star Enters.*, 183 F.3d 184, 190 n. 5 (3d Cir. 1999).

and hold a cryptocurrency as its primary treasury asset.[3] The investors in the public company can then gain exposure to the appreciation in asset value of the cryptocurrency held in the treasury. Until mid-2025, however, the DAT model centered on Bitcoin; no U.S-public company had yet adopted BNB as a treasury asset.[4] During the summer of 2025, CEA became the first U.S. public company to hold BNB as a corporate treasury. *Id.*; Compl. ¶¶ 2, 18-19. This naturally involved a complex negotiation, between sophisticated parties, and a series of agreements. Compl. ¶¶ 18-19, 23-24.

The pleading alleges that CEA, a sophisticated public company, advised by counsel, executed the AMA as part of a negotiated $500 million transaction that involved interrelated agreements and additional contracting parties and performed under that agreement for months with full knowledge of the terms it now challenges. Later, CEA sought to renegotiate the agreement.

During the negotiations alleged in the Complaint, CEA did not allege that the AMA was unconscionable. It was only after it failed to retrade the deal that CEA asserted that the agreement was void and unconscionable from its inception, a claim which "courts are particularly reluctant" to find "in favor of sophisticated corporations." *FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842, 862 (Del. Ch.), *aff'd sub nom. A & R Logistics Holdings, Inc. v. FdG Logistics LLC*, 148 A.3d 1171 (Del. 2016); *see also Reserves Mgmt., LLC v. Am. Acq. Prop. I, LLC*, 86 A.3d 1119 (TABLE), 2014 WL 823407, at *9 (Del. 2014) (same).

The facts, as alleged in the Complaint, establish that the Complaint fails on its face.

---

[3] *See Why Digital Asset Treasury Companies Are Changing U.S. Public Markets*, FORBES (Nov. 13, 2025), https://www.forbes.com/councils/forbesbusinesscouncil/2025/11/13/why-digital-asset-treasury-companies-are-changing-us-public-markets/.

[4] *See BNB crosses the corporate Rubicon in $500m CEA reserve strategy*, CRYPTO NEWS (Aug. 5, 2025), https://crypto.news/bnb-crosses-the-corporate-rubicon-in-500m-cea-reserve-strategy/

1. The AMA is neither substantively nor procedurally unconscionable. Each provision CEA identifies—the termination mechanics, the liquidated-damages clause, the Strategic Committee's composition, the revocation provision, the damages provision, and the management fee—is unremarkable, favorable to CEA, or both, particularly when read together with the surrounding terms that CEA's Complaint omits. CEA is a sophisticated, Nasdaq-listed public company whose board of directors approved the agreement after CEA represented that it was experienced in engaging asset managers, qualified as both an accredited investor and a qualified institutional buyer, and had the opportunity to review every term before signing.

2. Further, the dispute over the liquidated damages provision is not ripe and, in any event, is not an unenforceable penalty. Its amount tracks precisely what 10X would have earned had the Agreement run its course. Delaware law asks nothing more of a liquidated damages clause.

3. The Court should deny leave to amend and dismiss both Counts I and II with prejudice (in the event that the Court determines that Count II is ripe). Both conscionability and enforceability turn on the AMA's own terms and on CEA's own representations, already before the Court. No additional allegation can rewrite either.

## STATEMENT OF ALLEGED FACTS

The following alleged facts are drawn from the Complaint and the documents incorporated therein by reference and are assumed true for the purposes of this Motion.

### I. The Parties

CEA is a Nasdaq-listed, publicly traded Nevada corporation headquartered in Colorado. Compl. ¶¶ 2, 11. Before the transaction at issue, CEA operated two business lines outside the digital-asset industry: Surna Cultivation Technologies and Fat Panda, a controlled-environment

agriculture business, and a vape and e-cigarette business. *Id.* ¶¶ 2, 18. 10X Capital Partners is a Delaware limited liability company with its principal place of business in New York. *Id.* ¶ 12.

## II. The BNB Treasury Transaction

In August 2025, CEA became the world's largest corporate treasury of BNB. *Id.* ¶ 2, 24.

The DAT transaction involved three interconnected agreements. On July 28, 2025, CEA signed a Securities Purchase Agreement and a Strategic Advisor Agreement.[5] *Id.* ¶ 23. On August 5, 2025, CEA closed the private placement and executed the AMA. *Id.*¶ 24.

## III. CEA Agrees To The Terms Of The AMA And Performs Under It

CEA's independent board of directors approved the AMA, and CEA executed it as part of the same $500 million transaction it undertook to build its DAT business. *Id.*¶¶ 6.

The AMA provided for the management of the DAT, appointing 10X as Asset Manager. Compl. ¶3. CEA represented and warranted that it "is experienced in engaging Asset Managers and is aware of the risks associated with such engagements," and that it understood its treasury could suffer substantial diminution in value, up to and including "complete loss." AMA §8(i). It represented that it "has reviewed all other materials and agreements provided by the Asset Manager" and "has had the opportunity to ask questions regarding such materials and agreements." *Id.* §8(j). And it represented that it is both an "accredited investor" and a "qualified institutional buyer." *Id.* §8(k, m).

Following the closing of the Securities Purchase Agreement and the AMA, the majority members of CEA's board of directors resigned, and were replaced by new board members. Compl. ¶ 6.

---

[5] 10X BNB Cayman Sponsor and 10X Holdings LLC are parties to those agreements, which are distinct from the defendant in this action.

For the nine months that followed execution, CEA performed under the AMA: it accepted 10X's services and, as alleged by the Complaint, paid 10X monthly without interruption from the closing through April 30, 2026.[6] *Id.* ¶¶ 4, 36.

## IV. CEA Seeks To Renegotiate The AMA

On November 26, 2025, a public filing partially disclosed the existence of the Strategic Services Agreement between 10X and YZi Labs and the fee split it contained. *Id.* ¶ 29. CEA alleges that the filing was "the first time the majority of CEA's board, aside from the 10X affiliated directors, learned of the Strategic Services Agreement's existence." *Id.* CEA does not allege any material impact from the Strategic Services Agreement; indeed, all fees paid to YziLabs were to be paid by 10X at no additional cost to CEA. *Id.* ¶ 26.

CEA then entered into discussions with 10X to negotiate what CEA describes as "reasonable and market standard arms-length amendments to the AMA's terms." *Id.* ¶ 30. That culminated in a proposed amendment. *Id.* ¶ 31. Notably, at the time, CEA did not claim, as it does now, that the agreement was void. Instead, it sought to retrade the deal.

On March 8, 2026, CEA director Annemarie Tierney sent 10X a draft amended AMA that would have, among other things, dramatically shortened the term from twenty years to two years and reduced the management fee from 1.75% to a 0.50% base fee plus a capped performance fee, and limited the liquidated-damages. *Id.* ¶ 31. Though under no obligation, 10X engaged in discussions with CEA and sent CEA a counter-proposal. *Id.* ¶¶ 32-33.

By CEA's own allegation, "[w]hile attempting to renegotiate the AMA's terms, CEA continued to perform under the Agreement" through April 30, 2026. *Id.* ¶ 36.

---

[6] Although not part of the Complaint or relied on for purposes of this motion, 10X notes that for the initial months of performance of the AMA, 10X did not charge the monthly fee due, in order to assist CEA with the initial development of the new enterprise.

CEA rejected 10X's counterproposal.

**V. CEA Files This Lawsuit**

Having failed to extract the terms it wanted, CEA commenced this action. It now asks the Court to declare the AMA void *ab initio* as unconscionable and that the liquidated damages provision is unenforceable. *Id.* ¶¶ 52–71 & Prayer for Relief. To support those claims, CEA attempts to describe the parties' failed renegotiations and other events after signing (spending at least four of the twenty pages of the Complaint), ignoring that a contract must be unconscionable *at the time of formation* for its claim to survive. *See generally* Compl. ¶¶ 4-5, 24, 27-36, 47; *see also Rummel Klepper & Kahl, LLP v. Delaware River & Bay Auth.*, 2022 WL 29831, at *14 (Del. Ch. Jan. 3, 2022). Those claims are baseless, not ripe, and should be dismissed.

## ARGUMENT

**I. Legal Standard**

10X brings this motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). "Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed if it 'fail[s] to state a claim upon which relief can be granted.'" *Rheault v. Halma Holdings Inc.*, 2023 WL 8005318, at *2 (D. Del. Nov. 7, 2023). When ruling on a Rule 12(b)(6) motion, the Court must accept as true all well pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *Doe v. Delie*, 257 F.3d 309, 313 (3d Cir. 2001). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[7] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court "need not credit

[7] Unless otherwise stated, all internal quotation marks and citations are omitted.

the nonmovant's conclusions of law or unreasonable factual inferences." *Curay-Cramer v. The Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130 (3d Cir. 2006).

"A court must grant a motion to dismiss pursuant to Rule 12(b)(1) if it lacks subject matter jurisdiction to hear a claim", and "in order for a court to have subject matter jurisdiction over a dispute, the matter brought before the court must present a ripe case or controversy." *Light v. Davis*, 694 F. Supp. 3d 541, 548 (D. Del. 2023), aff'd in part, vacated in part, remanded, No. 23-2785, 2024 WL 4144066 (3d Cir. Sept. 11, 2024).

## II. The Complaint Fails To State A Claim (Rule 12(b)(6)) And The Liquidated Damages Claim Is Not Ripe For Adjudication (Rule 12(b)(1))

CEA has failed to sufficiently plead both its counts for related but independent reasons: Count I because the plain language of the AMA shows it is neither substantively nor procedurally unconscionable and Count II because, independent of unconscionability, the liquidated damages amount bears a direct relationship to 10X's expected revenue had CEA performed throughout the term of the AMA. Moreover, there is no case or controversy regarding liquidated damages.

### A. The AMA is Neither Substantively Nor Procedurally Unconscionable

In Count I of the Complaint, CEA asks the Court to provide the extraordinary relief of declaring that the AMA is void *ab initio* as unconscionable. It does not come close to meeting the high burden applicable to such a claim.

"Unconscionability is a concept that is used sparingly." *Waters v. Delaware Moving & Storage*, Inc., 300 A.3d 1, 27 (Del. Super. Ct. 2023). Delaware's fundamental policy is to "uphold[] freedom of contract," thus Delaware courts invoke "this doctrine with extreme reluctance and only when all of the facts suggest a level of unfairness that is unconscionable." *Id.* "[C]ourts are particularly reluctant to apply the doctrine in favor of sophisticated corporations."

*FdG* Logistics, 131 A.3d at 862; *see also Reserves Mgmt., LLC v. Am. Acq. Prop. I, LLC*, 86 A.3d 1119 (TABLE), 2014 WL 823407, at *9 (Del. 2014) (same).

"An unconscionable contract is one that is so one-sided as to be oppressive and that no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept, on the other." *FdG Logistics*, 131 A.3d at 862. "To find unconscionability, the court must find both procedural and substantive unconscionability." *Rummel*, 2022 WL 29831, at *14 (Del. Ch. Jan. 3, 2022) (citing *Chemours Co. v. DowDuPont Inc.*, 2020 WL 1527783, at *12 (Del. Ch. Mar. 30, 2020)). "Whether a contract is unconscionable is determined at the time it was made." *Id.* CEA has failed to sufficiently plead either substantive or procedural unconscionability.

*The AMA Is Not Substantively Unconscionable*. The Complaint broadly asserts that "the terms of the AMA are so one-sided as to be oppressive." Compl. ¶¶ 56, 59. However, no specific allegation in the Complaint supports that sweeping conclusion.

At the pleading stage, the Court "must disregard [] conclusory allegations stating that [Defendant's] scheme is oppressive[.]" *Ciser v. Nestle Waters N. Am. Inc.*, 596 F. App'x 157, 163 (3d Cir. 2015). Instead, "[s]ubstantive unconscionability requires a finding of terms evidenc[ing] a gross imbalance that shocks the conscience or if the bargain is on terms so extreme as to appear unconscionable according to the mores and business practices of the time and place." *Rummel*, 2022 WL 29831, at *14. No such allegations are present here.

In support of its claim, CEA points to a scattershot of provisions it contends are "oppressive" by cherry picking language and relying on events that took place after contract formation—neither of which is permissible. *See Rummel*, 2022 WL 29831, at *14. Six provisions make up the entirety of CEA's substantive-unconscionability theory: the termination provision, the liquidated-damages provision, the Strategic Committee's composition, the revocation

provision, the management fee provision, and the damages-limitation provision.[8] CEA's arguments for each of those fails when read in context alongside the terms CEA omits. Taken together, those terms do not evince a "gross imbalance" that "shocks the conscience"; they are the ordinary terms of an arm's-length transaction, heavily negotiated between CEA and 10X.

***Termination Provision.*** Nothing about the termination provision is "one-sided in favor of 10X." Compl. ¶ 45. CEA has various means through which it can terminate the AMA: (1) with 120 days' notice if 10X underperforms, (2) with 60 days' notice for fraud, bad faith causing material breach, gross negligence or willful misconduct by 10X, and (3) even for "any reason" subject to damages. AMA § 13(a, b, c). Further, CEA is due ample notice should 10X wish to terminate. *Id.* § 13(b).

Rather than a "gross imbalance," the small differences in termination rights (which are generally afforded to both sides) reflect a choice by the parties given their different roles and exposure. (Remedies need not be symmetric, Restatement (Second) of Contracts § 79 (1981).)

***Liquidated Damages Provision***. Similarly, CEA fails to plead that the liquidated damages provision is substantively unconscionable. Liquidated damages provisions are frequently upheld by Delaware courts. *Middlesex Mut. Assur. Co. v. Delaware Elec. Signal Co*, 2008 WL 4216145, at *3 (Del. Super. Ct. Sept. 11, 2008) (commenting generally that "Delaware courts have upheld

[8] CEA cursorily mentions the damages provision (AMA § 13(e)) ***in just half of a sentence*** as another supposedly oppressive provision, taking issue with the lack of reciprocation if CEA breaches. Compl. ¶ 7. That provision, which involves consequential, indirect, and lost profit damages, cannot be viewed as substantively unconscionable, as such provisions are ubiquitous in commercial contracts. *See, e.g.*, *Chatham Fin. Corp. v. Milhaus*, LLC, 807 F. Supp. 3d 373 (D. Del. 2025); *AcademixDirect, Inc. v. Digital Media Sols., LLC*, 2020 WL 3868302, at *1 (Del. Super. Ct. June 26, 2020); *JJCK, LLC v. Project Lifesaver Int'l*, 2011 WL 2610371. At *10 (D. Del. July 1, 2011). Moreover, contract law recognizes that difference in treatment between the parties do not necessarily make an agreement unconscionable, *see infra* at the "Termination Provision" section.

the enforceability of" liquidated damages clauses). The burden lies with the party opposing the liquidated damages to proffer evidence that would suggest the provision is unconscionable. *Standard Gen. L.P. v. Charney*, 2017 WL 6498063, at *24 (Del. Ch. Dec. 19, 2017), *judgment entered,* (Del. Ch. 2018), and *aff'd*, 195 A.3d 16 (Del. 2018). CEA fails to do so.

As a threshold matter, CEA did not just agree to the liquidated damages provision—it expressly "acknowledge[d] and agree[d] that the actual damages … would be difficult to ascertain and that this amount represents a reasonable estimate therefore." AMA § 13(a). Delaware courts have found agreement as to the reasonableness of liquidated damages, even less explicit than this, to be evidence of the parties' intent to be bound by the provision. *See, e.g.*, *Meritage Fund LLC v. Bohoho Grp., LLC*, 2025 WL 3854813, at *8 (Del. Super. Ct. Dec. 8, 2025) (liquidated damages not unconscionable where "***the parties agreed during negotiations***, due to the difficulty of ascertaining the damages, that the damages should be capped at the total amount of the proposed purchase price.") (emphasis added). That agreement was not a mere formality. The fees 10X would earn over the remaining Term represent a floor on 10X's actual loss from early termination—the true cost of losing the Asset Manager mid-strategy could well have exceeded that fee stream and defied precise calculation at the time of contracting.

CEA similarly agreed ***twice*** that the fee specifically represents "liquidated damages and not [] a penalty." AMA § 13(a); *see also id.* (the fee amount "represents a reasonable estimate" of damages and is "not a penalty."). Delaware courts have declined to find provisions with the exact same language unconscionable. Indeed, in *Brazen v. Bell Atlantic Corp.*, the Delaware Supreme Court admonished the Court of Chancery for characterizing a $550 million fee as anything other than liquidated damages, because "[t]he express language in section 9.2(e) of the agreement

unambiguously states that the termination fee provisions '***constitute liquidated damages and not a penalty***." 695 A.2d 43, 47 (Del. 1997) (emphasis added).

CEA complains about the amount of liquidated damages, claiming that $100 million would be due upfront. Compl. ¶¶ 1, 7-8, 40, 56. Not so. The plain language of the provision states the damages would be paid "monthly". AMA § 13(a). Furthermore, the AMA has not been terminated. Because of that, the amount of any liquidated damages is speculative and contingent on however much of the term remains outstanding if and when termination occurs. In any event, Delaware courts have upheld far higher liquidated damages than the exaggerated amount CEA alleges. *Id.* (rejecting assertion that a $550 million fee in liquidated damages is unconscionable or "egregiously large").

The measure of liquidated damages as provided for in the AMA is perfectly logical—the liquidated damages provision here "is intended by the parties to operate in lieu of performance." *Charney*, 2017 WL 6498063, at *24 (Del. Ch. Dec. 19, 2017). The AMA merely seeks to compensate 10X for the fees it expected to receive during the contractually-specified twenty-year engagement *i.e.*, "the amount payable in the event of" CEA's actual performance. *Id.* (liquidated damages provision that accelerated the principal of notes and accrued interest is not unconscionable) (citing *Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.,* N.E.2d 113, 116 (1979) (enforcing liquidated damages that were "no greater than the amount [defendant] would have paid had it fully performed" its obligations under the contract)).

CEA makes no argument that the AMA's twenty-year term on its own presents any unfairness, except to complain that its length influences the amount of liquidated damages. Nor can it—courts have upheld long contracts. *See Silver Lake Off. Plaza, LLC v. Lanard & Axilbund,*

*Inc.*, 2014 WL 595378, at *8 (Del. Super. Ct. Jan. 17, 2014) (upholding length of agreements because they were "not indefinite nor is their possibly long life automatically fatal").

For this same reason, CEA's admonition that the provision applies "even in the absence of ***any damages***" and that it does not take into account 10X's "duty to mitigate" is inapposite. Compl. ¶ 41. The damages are exactly what the parties agreed to—receipt of the expected benefit of the bargain, and 10X "owe[s] no duty to mitigate" when an "acceleration clause" is deemed "valid." *Charney*, 2017 WL 6498063, at *24.

***Strategic Committee.*** CEA also takes issue with the structure of the Strategic Committee (which oversees the investment strategy) because, according to CEA, the AMA requires that the "initial members" be Messrs. Thomas and Monje of 10X, thereby purportedly giving 10X "veto power over CEA's investment strategy."[9] Compl. ¶ 27. CEA's assertion is unfounded, and hardly one that would "shock the conscious."

Once again, CEA ignores key provisions that render any purported "shock" implausible. It is the CEA ***Board*** that appoints the Strategic Committee going forward. AMA § 8(b) (CEA's owns representations). While the AMA provides Messrs. Thomas and Monje initially serve as Strategic Committee members, there is no requirement that they remain on the Committee or that subsequent members be affiliated with 10X. Further, the Committee can "add up to three additional members," who also have no requirement as to affiliation, so that, by its terms, the AMA provided that members affiliated with 10X could be in the minority. *Id*. Indeed, neither Mr. Thomas, Mr. Monje (nor Mr. Read) currently serves on the Strategic Committee. Compl. ¶ 27.

[9] The rest of Paragraph 27 goes on to explain events that, even if true (they are not), offer no support for an unconscionability claim because they would have had to take place after contract formation. Compl. ¶ 27; *see Rummel*, 2022 WL 29831, at *14. The same is true for CEA's allegations of actions the Strategic Committee members did not take. Compl. ¶ 47.

Moreover, 10X is expressly bound to exercise its authority "in coordination with the Client and its Chief Investment Officer," and to follow CEA's "Investment Guidelines," any deviation from which requires approval from CEA. AMA § 3(b, c). CEA can also instruct 10X on trading activity. *Id.* § 5. Accordingly, the assertion that the AMA gives universal control over the entire Trading Strategy cannot be squared with other provisions to which CEA agreed.

In any event, despite its generic complaints that the Strategic Committee included "Mr. Thomas and Mr. Monje as initial members," CEA makes no effort to explain why the committee overseeing investment strategy and monitoring trades ***should not*** consist of investment professionals, much less why the composition is inconsistent with industry practice. Compl. ¶ 27. Until the transaction closed, CEA's business lines were outside of the finance and investment industry, so it made sense for 10X personnel to assist with that role. *Id.* ¶ 18.

***Authority and Power of Attorney***. Similarly, CEA's purported "concerns" over the potential revocation of 10X's authority appear limited to the effect on the liquidated damages provision. *See* Compl. ¶¶ 42, 51. CEA concedes that its own shareholders can revoke 10X's authority, after which "10X would be unable to continue performance under the AMA." *Id.* ¶ 42. *See also id.* ¶ 51 (10X's "broad grant of authority remains subject to the oversight of the shareholders.")(citing AMA § 3(a). To the extent CEA cites this as a negative, it fails to explain why granting shareholders the sole ability to revoke 10X's authority is problematic. The 75% voting threshold is simply a bargained for term, which does not shock the conscience.

***Fees paid to 10X.*** CEA complains about the "exorbitant" and "extraordinary" 1.75% management fee that it agreed to pay 10X in exchange for 10X's services under the AMA. Compl. ¶¶ 7, 25; Compl. Ex. 2, Schedule C-1. CEA's sole support for this characterization is that 1.75% is a "multiple of market standard"—without stating any explanation of what this market

standard supposedly is. Compl. ¶ 7. Notably, CEA alleges that "Mr. Thomas claimed that the 'majority of comparable DATs with AMAs had similar liquidated damages or equivalent termination fee provisions'…"Compl. ¶ 33. No allegation specifically contradicts that assertion.

CEA's unconscionability claim cannot stand on such allegations. Even if 10X's fees were above market as alleged (they are not), high fees are not *ipso facto* unconscionable, especially when negotiated between sophisticated parties. *See Brazen*, 695 A.2d at 46-50 (rejecting argument that a $550 million termination fee was "unconscionably high.").

Thus, CEA fails to plead anything more than self-serving legal conclusions that the AMA is unconscionable based on the terms it cherry picks, requiring dismissal of Count I .

*The AMA Is Not Procedurally Unconscionable*. "Procedural unconscionability examines the procedures that led to the contract with the goal of evaluating whether seemingly lopsided terms might have resulted from arms'-length bargaining." *Talkdesk, Inc. v. DM Trans, LLC*, 2024 WL 2799307, at *7 (Del. Super. Ct. May 31, 2024). Courts will look at the "relative bargaining strength of the parties and whether the weaker party could make a meaningful choice." *Id.* "There is no deprivation of meaningful choice if a party can walk away from the contract." *Ketler v. PFPA, LLC*, 132 A.3d 746, 748 (Del. 2016).

A "mere disparity between the bargaining power of parties to a contract will not support a finding of unconscionability," *Rummel,* 2022 WL 29831, at *14, because "the parties' bargaining power will rarely be equal." *James v. Nat'l Fin., LLC*, 132 A.3d 799, 827 (Del. Ch. 2016).

The AMA was agreed to by two "sophisticated parties engaged in arm's-length transaction" and thus "[i]t is not alleged, nor would it be credible to suggest" that 10X "wielded such overwhelming bargaining power as to present" CEA, a qualified institutional investor with

experience negotiating with asset managers "with an absence of meaningful choice." *FdG Logistics*, 131 A.3d, at 862.

CEA does not contend that it is not a sophisticated party—nor could it. CEA is a publicly traded company listed on Nasdaq. Compl. ¶ 2. The AMA was approved by CEA's then-directors and officers, each of whom owed fiduciary duties to the company and its stockholders.[10] *Id.* ¶ 6. CEA is an accredited investor and a qualified institutional buyer (AMA § 8(k, m)), and it represented that it "is experienced in engaging with asset managers" (*id.* § 8(j)). *See Charney*, 2017 WL 6498063, at *18 ("[T]he record reflects that Charney is a sophisticated businessman … for a pubic company.").

Nor does CEA contend that the parties had unequal bargaining power. This is typically sufficient to defeat procedural unconscionability on its own. *Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 624 (Del. 2023) ("Unconscionability … traditionally requires that the party with superior bargaining power used it to take unfair advantage of his weaker counterpart."); *see also Waters v. Delaware Moving & Storage, Inc.*, 300 A.3d 1, 28 (Del. Super. Ct. 2023) ("There [was] scant evidence that Subcontractor unfairly exerted its bargaining power to take advantage of Plaintiff," or otherwise "used its position or status," even where only defendant was a sophisticated party). Rather, CEA solely alleges that 10X gave it three days to decide on a "take it or leave it" offer, Compl. ¶ 6, else 10X would rescind the PIPE transaction as a whole, *id.* ¶ 21. That does not meet the standard for unconscionability.

First, that the terms purportedly "were presented on a take-it-or-leave basis" is "not sufficient to establish" procedural unconscionability. *Waters*, 300 A.3d at 26.

[10] CEA's complaint that ***its own*** directors "stood financially to gain" and that a majority of them were "on their way out" is hollow in a complaint against 10X. Compl. ¶ 6.

Nor does CEA explain why, even taking its allegations as true, three days is an unconscionable amount of time between receipt of a twenty-four page document and its signing to evaluate it. Quite the opposite—CEA actually admits that events were moving quickly in the industry. Compl. ¶ 6 ("The transaction was one amongst a flurry of similar expedited offers by investment firms to take over DATs"). CEA otherwise makes no comment on how the timeline allegedly affected its decision-making. Nor could it—CEA represented that it reviewed all materials and "had opportunity to ask questions," AMA § 8(j), and understands the risks associated with entering into an investment, *id.* §§ 8 (i), 9(b). In any event, CEA must do more to show how it was stripped of its ability to negotiate. *Rummel,* 2022 WL 29831, at *14 ("RK&K fails to show that its lack of ability to negotiate is sufficient to prove procedural unconscionability."); *Waters*, 300 A.3d at 26 (explaining that "a plaintiff must [] show that the contract at issue was gained through sheer economic force under circumstances where assent to its terms was absent.").

Further, the fact that 10X allegedly did not want to participate in the PIPE transaction unless the AMA terms also applied is not "unconscionable"—it is an arms-length business decision 10X was entitled to make. Indeed, courts have found pressure not to lose even crucial aspects of a business to be insufficient to plead unconscionability. *See, e.g.*, *Talkdesk, Inc.,* 2024 WL 2799307, at *8 (dismissing counterclaim for unconscionability at pleading stage where the court "understands that shifting to a service provider during the pandemic may have been crucial to its business"). Here, though the DAT was a business opportunity for CEA, its business would not have been undermined if CEA did not enter into the DAT transaction so it "could have refrained from" engaging in the transaction "if it found the terms of the agreement unacceptable." *Rummel,* 2022 WL 29831, at *14.

Finally, CEA grasps at straws when asserting that 10X failed to disclose that it had no ability to negotiate due to a fee-sharing agreement with YZI Labs. Compl. ¶¶ 22, 26, 29. 10X had no contractual obligation under the AMA to renegotiate its terms. CEA has no standing to complain that 10X entered into a separate agreement that purportedly cabined 10X's ability to revise a binding contract. As noted, an unconscionability claim must be based on the conditions present when entering into the contract at issue, rather than subsequent events.

CEA fails to state a claim for either substantive or procedural unconscionability, thus Count I should be dismissed.

**B. CEA's Liquidated Damages Claim Is Not Ripe, And The Liquidated Damages Provision Bears A Relationship To 10X's Anticipated Damages**

CEA asserts, in the alternative, that just the liquidated damages provision is an unenforceable penalty. Compl. ¶ 69. That claim is not ripe and, in any event, should be dismissed.

*CEA's Claim Is Not Ripe And CEA Shouldn't Waste The Court's Resources*. Delaware and courts in the Third Circuit decline to exercise jurisdiction over a case unless the underlying controversy is ripe. *Gen. Cable Corp. v. Scottsdale Indem.*, 2025 WL 2576384, at *2 (D. Del. Sept. 5, 2025) (citation omitted). A plaintiff seeking protection against a feared future event must show that the event's occurrence is real, substantial, and of sufficient immediacy to warrant declaratory relief; a harm contingent on a future event will likely not satisfy that standard. *Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Loc. Union No. 66*, 580 F.3d 185, 190 (3d Cir. 2009) (quoting omitted).

For a dispute to be justiciable, rather than an improper request for an advisory opinion, there must be an actual dispute between adverse litigants, as distinguished from an opinion advising what the law would be on a hypothetical state of facts; where a party has not articulated the specific conduct on which its claim rests or when the relevant event will occur, the inquiry is

simply too premature. *In re W.R. Grace & Co.*, 475 B.R. 34, 97, 183 (D. Del. 2012), *aff'd*, 729 F.3d 332 (3d Cir. 2013).

CEA has not terminated the AMA, does not allege any intention to do so, and by its own admission continued performing. Compl. ¶ 36. No liquidated damages obligation has arisen, and none may ever arise. That defect is compounded because any such obligation, even if triggered, would not be a presently ascertainable sum: it would be "paid monthly throughout the Term," AMA § 13(a), from a fee equal to "1.75% of the Treasury Assets under management," which consist of BNB, a cryptocurrency whose value fluctuates continuously. Compl. Ex. 2, Schedule C-1. The Court, therefore, lacks subject matter jurisdiction to decide Count II.

The point is illustrated by *Pai v. DRX Urgent Care, LLC*. There, the plaintiffs asked the court to declare a non-compete covenant void and unenforceable, but they had not alleged any plan to compete, and the court held that because this claim depends on future events that may not occur, it is not ripe for adjudication. No. CIV.A. 13-3558 JAP, 2014 WL 837158 (D.N.J. Mar. 4, 2014), aff'd sub nom. *Fabbro v. DRX Urgent Care*, LLC, 616 F. App'x 485 (3d Cir. 2015). The Court noted that the claim "read as a lament for what they now consider have been a poor business decision." and "fall short of stating any viable legal claim" *Id.* at 13. The same logic applies here: CEA has not alleged that it has terminated, or plans to terminate, the AMA at all.

The Court should decline to reach Count II. Even if the Court determines it has subject matter jurisdiction, it should still exercise its discretion to decline to decide CEA's declaratory claim, because it would be a waste of the Court's resources to do so. *Band's Visit Nat'l Tour LLC v. Hartford Fire Ins. Co.*, 307 A.3d 387 (Del. Super. Ct. 2023).

*In the Alternative, CEA Has Failed To Plead A Case Of Unenforceability*. In the event the Court reaches the merits of the liquidated damages provision, Delaware courts apply a two-prong

test to distinguish an enforceable liquidated-damages clause from a penalty: whether damages were certain at the time of contracting, and whether "the amount at issue [is] unconscionable or not rationally related to any measure of damages a party might conceivably sustain." *Delaware Bay Surgical Servs., P.C. v. Swier*, 900 A.2d 646, 651 (Del. 2006). *Smart Sand, Inc. v. US Well Servs. LLC*, 2021 WL 2400780, at *8 (Del. Super. Ct. June 1, 2021)

On the first prong, Delaware courts have held that "where the parties themselves have unambiguously concluded that such a value is difficult to ascertain," courts "will not construe that conclusion differently." *Bhaskar S. Palekar, M.D., P.A. v. Batra*, 2010 WL 2501517, at *7 (Del. Super. Ct. May 18, 2010). CEA had already agreed to that conclusion, word for word. *See* AMA § 13(a). Accordingly, the Court must "rel[y] on that objective manifestation of the parties intent, as stated in the Agreement." *Bhaskar,* 2010 WL 2501517, at *7.

On the second prong, because CEA's Count I already fails to plead that the liquidated damages provision is unconscionable, *see* Section II.A *supra*, CEA's Count II theory can succeed only if the amount is "not rationally related to any measure of damages" 10X "might conceivably sustain." *Delaware Bay Surgical*, 900 A.2d at 651. CEA objects only to the fact that the amount is large and to the AMA's twenty-year term, neither of which bears on whether the figure is *rationally related* to what 10X stood to earn. Compl. ¶¶ 40-41.

CEA's own allegations confirm the rational relationship between the liquidated damages amount and 10X's expectation interest. As noted above, the amount payable under § 13(a) tracks, dollar for dollar, the compensation 10X would receive had CEA simply allowed the AMA to run its course. AMA § 13(a). That is precisely the relationship Delaware law asks for.

In *Charney*, the court held that a liquidated-damages provision was not a penalty because "the amount payable upon an event of default correlates precisely to the amount payable in the

event of Charney's performance" and because the clause was "intended by the parties to operate in lieu of performance." 2017 WL 6498063 at *24.

CEA's remaining objections—that the clause applies even where termination is for cause, or follows a shareholder vote revoking 10X's authority, Compl. ¶¶ 41-42, 66-69—go to when the clause is triggered, not to whether the resulting figure is rationally related to 10X's anticipated loss once triggered. Delaware law does not require that a liquidated sum shrink because the terminating party had cause; it asks only whether the figure reasonably approximates the value 10X lost—here it does. CEA could have negotiated for such a provision but did not do so; its failure at the negotiating table does not render the provision unenforceable.

Thus, CEA fails to state a claim for unenforceability of the liquidated damages provision, thus if the Court ever reaches Count II, it should also be dismissed.

### C. Leave To Amend Would Be Futile

Should the Court agree that CEA's Complaint fails to state a claim, it should dismiss this action with prejudice. Leave to amend need not be granted where a proposed pleading could not survive a renewed motion to dismiss. *Foman v. Davis*, 371 U.S. 178, 182 (1962) (leave to amend denied for reasons including "futility of amendment"). "A complaint that sets out sufficient facts to demonstrate affirmatively that the plaintiff has no right to recover is properly dismissed without leave to amend." *Ross v. Meagan*, 638 F.2d 646, 649 (3d Cir. 1981) (citations omitted). The defects identified above are of that kind. Neither turns on a gap in CEA's factual allegations; both turn on the AMA's own terms and CEA's admissions. As such, any amendment would be futile.

## CONCLUSION

For the foregoing reasons, the Court should enter an Order granting the Motion and dismissing the Complaint with prejudice.

/s/ *Michael A. Barlow*
Michael A. Barlow (#3928)
Morgan R. Harrison (#7062)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
500 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com
morganharrison@quinnemanuel.com

*Attorneys for Defendant 10X Capital Partners LLC*

OF COUNSEL:

Alex Spiro*
Michael E. Swartz*
Jianjian Ye*
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
(212) 849-7000
alexspiro@quinnemanuel.com
michaelswartz@quinnemanuel.com
jianjianye@quinnemanuel.com

* *pro hac vice* pending

Dated: July 28, 2026