**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CEA INDUSTRIES, INC., | : | |
| Plaintiff, | : | |
| v. | : | C.A. No.: 1:26-cv-00595-JLH |
| 10X CAPITAL PARTNERS LLC, | : | |
| Defendant. | : | |

**PLAINTIFF'S ANSWERING BRIEF**
**IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**


**COLE SCHOTZ P.C.**
Andrew L. Cole (No. 5712)
James S. Green, Jr. (No. 4406)
Nathaniel J. Klepser (No. 6975)
500 Delaware Avenue, Suite 600
Wilmington, DE 19801
(302) 652-3131 (Phone)
(302) 652-3117 (Fax)
acole@coleschotz.com
nklepser@coleschotz.com

*Attorneys for Plaintiff,*
*CEA Industries, Inc.*


Dated: August 14, 2026

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ....................................................................................4

LEGAL STANDARD....................................................................................7

ARGUMENT....................................................................................8

I. CEA'S UNCONSCIONABILITY CLAIM IS WELL PLEADED. ........................8

A. Dismissal of These Claims Is Not Appropriate at This Stage. ....................8

B. The AMA Is Procedurally Unconscionable. ...............................................9

C. The Onerous Terms of the AMA Are More Than Sufficient to Plead Substantive Unconscionability.......................................................12

1. 10X's Management Fees Are Excessively Priced. ........................13

2. The AMA Denies CEA Basic Rights and Remedies. ....................13

3. The AMA Contains an Arbitrary Penalty Provision......................15

4. The AMA Reflects an Overall Imbalance in the Bargain. .............15

II. CEA'S "LIQUIDATED DAMAGES" CLAIM IS RIPE AND WELL PLEADED. ....................................................................................16

A. The Declaratory Judgment Claim Is Ripe.................................................16

B. Section 13(a) Is an Unenforceable Penalty. ...............................................17

CONCLUSION....................................................................................20



71778/0001-53892601

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AcademixDirect, Inc. v. Digit. Media Sols., LLC*,
2020 WL 3868302 (Del. Super. Ct. June 26, 2020) ....15

*Alexander v. Anthony Int'l, L.P.*,
341 F.3d 256 (3d Cir. 2003)....15

*Andor Pharms., LLC v. Lannett Co.*,
2024 WL 1855112 (Del. Super. Ct. Apr. 29, 2024)....8, 10, 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....7

*In re AZEK Bldg. Prods., Inc., Mktg. & Sales Pracs. Litig.*,
82 F. Supp. 3d 608 (D.N.J. 2015) ....10

*Bakerman v. Sidney Frank Importing Co.*,
2006 WL 3927242 (Del. Ch. Oct. 10, 2006) ....10

*BitGo Holdings, Inc. v. Galaxy Digit. Holdings, Ltd.*,
319 A.3d 310 (Del. 2024) ....7, 8

*Bochniak v. Blenheim at Bay Pointe, LLC*,
2011 WL 2184180 (Del. Super. Ct. May 31, 2011) ....8

*Bradfield v. Heartland Payment Sys., LLC*,
2018 WL 5784998 (D.N.J. Nov. 5, 2018) ....17

*Brazen v. Bell Atl. Corp.*,
695 A.2d 43 (Del. 1997) ....18, 20

*BTG Int'l, Inc. v. Wellstat Therapeutics Corp.*,
2017 WL 4151172 (Del. Ch. Sept. 19, 2017)....19, 20

*Chatham Fin. Corp. v. Milhaus, LLC*,
807 F. Supp. 3d 373 (D. Del. 2025)....15

*Connelly v. Lane Constr. Corp.*,
809 F.3d 780 (3d Cir. 2016)....7

*Daniel v. Hawkins*,
289 A.3d 631 (Del. 2023) ....14

*Del. Bay Surgical Servs., P.C. v. Swier*,
900 A.2d 646 (Del. 2006) ....................18, 20

*Dow Chem. Can. Inc. v. HRD Corp.*,
909 F. Supp. 2d 350 (D. Del. 2012)....................18

*In re Elkins-Dell Mfg. Co.*,
253 F. Supp. 864 (E.D. Pa. 1966) ....................8

*FdG Logistics LLC v. A&R Logistics Holdings, Inc.*,
131 A.3d 842 (Del. Ch. 2016)....................12

*Foman v. Davis*,
371 U.S. 178 (1962)....................20

*Hopewell Logistics, Inc. v. Boomi, L.P.*,
2026 WL 2111406 (Del. Super. Ct. June 30, 2026) ....................9

*James v. Nat'l Fin., LLC*,
132 A.3d 799 (Del. Ch. 2016).................... *passim*

*JJCK, LLC v. Project Lifesaver Int'l*,
2011 WL 2610371 (D. Del. July 1, 2011) ....................15

*Johnson v. Tele-Cash, Inc.*,
82 F. Supp. 2d 264 (D. Del. 1999)....................8

*Ketler v. PFPA, LLC*,
132 A.3d 746 (Del. 2016) ....................12

*Marino v. Cross Country Bank*,
2007 WL 1810485 (D. Del. June 25, 2007)....................18

*Meritage Fund LLC v. Bohoho Grp., LLC*,
2025 WL 3854813 (Del. Super. Ct. Dec. 8, 2025) ....................20

*Pai v. DRX Urgent Care, LLC*,
2014 WL 837158 (D.N.J. Mar. 4, 2014) (Mot. ) ....................17

*Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Loc. Union No. 66*,
580 F.3d 185 (3d Cir. 2009)....................16, 17

*Reserves Mgmt., LLC v. Am. Acq. Prop. I, LLC*,
2014 WL 823407 (Del. 2014)....................12

*Rummel Klepper & Kahl, LLP v. Del. River & Bay Auth.*,
2022 WL 29831 (Del. Ch. Jan. 3, 2022)....................12

*Simon v. Smith*,
273 A.3d 321 (D.C. 2022) ....................................................................................14

*Standard Gen. L.P. v. Charney*,
2017 WL 6498063 (Del. Ch. Dec. 19, 2017)..............................................................20

*Stewart v. Stewart*,
41 A.3d 401 (Del. 2012) ......................................................................................14

*Surrick v. Killion*,
449 F.3d 520 (3d Cir. 2006)....................................................................................17

*Talkdesk, Inc. v. DM Trans, LLC*,
2024 WL 2799307 (Del. Super. Ct. May 31, 2024) ..................................................12

*Tekstrom, Inc. v. Savla*,
2006 WL 2338050 (Del. Super. Ct. July 31, 2006) ...................................................19

*Terrell v. Kiromic Biopharma, Inc.*,
297 A.3d 610 (Del. 2023) ...............................................................................11, 12

*Travelers Ins. Co. v. Obusek*,
72 F.3d 1148 (3d Cir. 1995).....................................................................................16

*Tropical Nursing, Inc. v. Ingleside Homes, Inc.*,
2006 WL 3579075 (Del. Super. Ct. Dec. 11, 2006) ..................................................19

*Unbound Partners Ltd. P'ship v. Invoy Holdings, Inc.*,
251 A.3d 1016 (Del. Super. Ct. 2021) ..........................................................11, 18

*Waters v. Del. Moving & Storage, Inc.*,
300 A.3d 1 (Del. Super. Ct. 2023).............................................................................12

*Wayne Land & Min. Grp. LLC v. Del. River Basin Comm'n*,
894 F.3d 509 (3d Cir. 2018)...............................................................................16, 17

*Wilmington Hous. Auth. v. Pan Builders, Inc.*,
665 F. Supp. 351 (D. Del. 1987)...............................................................................18

**Other Authorities**

Fed. R. Civ. P. 15(a)(2).............................................................................................20

Restatement (Second) of Contracts § 208 cmt. d.........................................................10

Plaintiff CEA Industries, Inc. ("CEA") respectfully submits this answering brief in opposition to Defendant 10X Capital Partners LLC's ("10X") Motion to Dismiss the Complaint (D.I. No. 15) (the "Motion" or "Mot.").

**PRELIMINARY STATEMENT**

10X is a self-described "merchant bank" that is "[t]hematically focused on digital transformation, including digital assets and digital infrastructure."[1] In July 2025, it set out to build a BNB digital-asset treasury company. Prior to July 2025, CEA was a Nasdaq-listed publicly traded micro-cap controlled-environment-agriculture and vape company with very limited finance operations. Compl. ¶ 19. 10X identified and then selected CEA as the vehicle for its plans. To achieve that, as set forth in the Complaint, 10X lured CEA in and then used economic leverage it unfairly obtained through deception to force upon CEA an Asset Management Agreement ("AMA") so extreme and one-sided that it runs afoul of Delaware law. 10X's Motion should be denied.

10X may not like the facts as alleged in the Complaint, but it must accept them as true at this stage. Yet, in its Motion, it seeks to argue the facts. 10X calls this case an effort by a successor board to "retrade" a deal. Mot. at 1. But that label presupposes a real and fair negotiation process. As set forth in the Complaint, no fair process occurred. On July 28, 2025—several days before the AMA was executed—CEA executed separate agreements (*e.g.*, Securities Purchase Agreement) to obtain a $500 million Private Investment in Public Equity ("PIPE"). 10X then threatened to terminate the PIPE unless CEA agreed to the AMA it provided within 72 hours of receipt, and without any negotiation or edits. Compl. ¶¶ 6, 18-23, 57. Moreover, 10X deceived CEA about the terms of the AMA. It concealed

[1] https://www.10xcapital.com (last visited Aug. 12, 2026).

that, prior to entering the AMA, 10X entered an undisclosed side deal to share 20% of its fees with a third party that was not providing asset management services to CEA and to limit the treasury management services 10X could provide around CEA's treasury assets. *Id.* ¶¶ 22, 26. Meanwhile, 10X assured CEA that the AMA was "solely between CEA and 10X." *Id.* ¶ 22. As set forth above, it in effect was not.

Given the dynamics, the terms in the AMA are, not surprisingly, extreme and one-sided. The AMA imposes a 20-year term during which CEA owes 10X an exorbitant monthly management fee that fluctuates based on the value of the Company's treasury assets, most significantly its BNB tokens. Compl. Ex. 1 (AMA) § 6(a); Compl. Ex. 2, Sch. C. On the Complaint's figures, those fees exceed $6 million per year. Compl. ¶¶ 8, 37-41. The AMA also strips CEA of control at every level: it grants 10X an irrevocable power of attorney over CEA's treasury, Compl. ¶ 50; AMA § 3(b), and, on 10X's own reading, bars CEA from terminating—even for cause—without continuing to pay 10X full monthly fees through 2045 for no services whatsoever in return. AMA § 13(a); Mot. at 11. Although CEA's Strategic Committee was tasked with overseeing 10X, it was initially composed of 10X's appointed directors. Compl. ¶¶ 27, 46; AMA § 8(b). Meanwhile, the majority of the (now former) Board members who approved the AMA resigned promptly after its execution and "stood to benefit financially from the signing of the AMA" through exit packages. Compl. ¶ 6.

To make matters worse, the AMA contains a liquidated damages provision so extreme that it is unenforceable under Delaware law. Under Section 13(a), if CEA were to terminate the AMA—for any reason, with or without cause, and at any time—10X's obligations to perform would cease, but CEA would remain obligated to continue paying

10X in full, monthly, through 2045. Compl. ¶¶ 41, 51; AMA § 13(a). Section 13(a) does not establish a stipulated sum, much less one that is a reasonable estimate of damages (as Delaware law requires). Instead, it requires CEA to continue to pay full freight each month, calculated daily based on the variable CEA treasury valuation, through 2045. On the Complaint's figures, those fees for the remainder of the 20-year term would total (for no services in return) an absurd sum of approximately $100 million (nearly 90% of CEA's market capitalization as of May 2026, and an even higher percentage today). The ultimate actual amount would be tied to the daily fluctuating value of CEA's treasury assets, which consist of volatile crypto tokens. The provision likewise requires payment over an entirely speculative 20-year term, in connection with a company that is basically a start-up in the crypto treasury business and holds a BNB token that itself is only nine years old. Moreover, Section 13(a) does not subtract costs 10X would save from non-performance. Section 13(a) is no more than a severe penalty that prevents CEA from terminating the AMA.

The facts as pleaded establish both dimensions of unconscionability. The AMA is procedurally unconscionable: 10X obtained its terms by leveraging the PIPE as bait to an unsuspecting micro-cap Nasdaq-listed company, imposing a 72-hour ultimatum, refusing to negotiate any terms or accept even a single word change, and concealing the fee split it had agreed to with YZI Labs Management Ltd. ("YZi Labs"). Compl. ¶¶ 6, 21-26, 57. The terms of the AMA are substantively unconscionable: it imposes a 20-year term, a penalty for termination (regardless of the basis for termination), an irrevocable power of attorney, restricted remedies, and (initially) a 10X appointed, self-policing Strategic Committee. Compl. ¶¶ 7-8, 25, 27, 37-56; AMA §§ 3(b), 6(a), 8(b), 11(b), 13(a).

Section 13(a) of the AMA independently supports declaratory relief. As noted above, the "liquidated damages" provision is an unenforceable penalty on its face. Compl. ¶¶ 37-41, 51, 67-68; AMA § 13(a). The dispute over the enforceability of the AMA's liquidated damages provision is ripe because the Complaint pleads an immediate controversy and its outcome will determine whether CEA may terminate an oppressive AMA without being forced to pay what would be a financially ruinous penalty to 10X (for no services at all) through 2045. Compl. ¶¶ 4, 8, 34, 37, 41, 51, 67-68; AMA § 13(a).

The Motion should be denied.

## STATEMENT OF FACTS

***10X Selected CEA and Used the PIPE to Dictate the AMA.*** 10X is a "merchant bank" that is "[t]hematically focused on digital transformation, including digital assets and digital infrastructure." *Supra* n. 1. In July 2025, 10X set out to build a BNB digital-asset treasury company and selected CEA as its vehicle. *Id.* ¶¶ 2, 18-19. Prior to July 2025, CEA was a Nasdaq-listed publicly traded micro-cap controlled-environment-agriculture and vape company with very limited finance operations. Compl. ¶ 19. 10X and placement agent Cantor Fitzgerald assembled a $500 million PIPE to fund the treasury. *Id.* ¶ 19.

As first presented, CEA would obtain a $500 million PIPE in exchange for entering several agreements, including a Securities Purchase Agreement ("SPA"). After the SPA was announced,[2] CEA's stock price rose from $8.26 (on July 25) to $82.88 per share (on July 28).[3] Separately, during AMA negotiations, 10X presented CEA with an AMA on an

[2] *See* https://www.sec.gov/Archives/edgar/data/1482541/000164117225021130/ex99-1.htm

[3] *See* https://www.tradingview.com/symbols/NASDAQ-BNC/

expiring 72-hour "take it or leave it" basis. Compl. ¶¶ 6, 20-21, 23. 10X "refused to negotiate over any of its terms." *Id.* ¶ 57. Likewise, under the Strategic Advisor Agreement executed days before the AMA, 10X held the right to nominate directors to CEA's board, and it seated Messrs. Thomas and Monje there on August 5, 2025—the same day the PIPE closed and the AMA was effective. *Id.* ¶¶ 5, 24. Days after the SPA was signed and publicly announced, the parties signed the AMA.

***10X Concealed a Side Agreement That Altered the AMA's Economics.*** Prior to execution of the AMA, 10X told CEA that the AMA was "solely between CEA and 10X," but concealed the existence of a Strategic Services Agreement that it had entered into with YZi Labs entitling YZi Labs to 20% of 10X's fees. *Id.* ¶¶ 22, 26. The side agreement constrained 10X's ability to modify the AMA's fee, term, and termination provisions. *Id.* ¶ 26. The majority of CEA's board, aside from the 10X-affiliated directors, did not learn of it until YZi Labs made a public filing with the SEC disclosing the existence of this agreement in late 2025. *Id.* ¶ 29.

***The AMA Coupled Extraordinary Compensation and Control with No Meaningful Exit.*** The AMA set a 20-year term and required CEA to pay 10X a management fee equal to 1.75% of its treasury assets, calculated daily (in a manner "customary in the industry" and paid monthly)—roughly $400,000 to $690,000 each month between August 2025 and April 2026. AMA, Sch. C; *see also* Compl. ¶¶ 25, 36, 38, 40; AMA § 6(a). 10X could terminate on 120 days' notice for any reason, but CEA could terminate without cause only if the Strategic Committee found significant underperformance. *Id.* ¶¶ 38, 45; AMA § 13(b). The Strategic Committee's initial members were 10X principals whom 10X had appointed. The Strategic Committee never adopted a

charter or held an official meeting. Compl. ¶¶ 5, 27, 46-47. Termination for cause requires CEA to comply with onerous procedural and evidentiary hurdles. *Id.* ¶¶ 38, 43-44; AMA § 13(b). Meanwhile, 10X held an irrevocable power of attorney and broad authority over CEA's treasury, while the AMA restricted CEA's remedies. *Id.* ¶¶ 49-50, 56.

***Section 13(a) Made Every Exit Ruinous.*** Notwithstanding the termination provision discussed above, termination by CEA is in effect impossible. Section 13(a) requires CEA, upon termination "for any reason," to pay "all fees and other compensation that would have accrued . . . through the end of the Term, paid monthly throughout the Term in accordance with the payment provisions herein," even though "all of the Asset Manager's obligations hereunder shall cease." Compl. ¶¶ 38-39; AMA § 13(a). This includes termination for cause or even a shareholder vote revoking 10X's authority. AMA §§ 13(a), 3(a). Section 13(a) also applies if 10X itself terminates the AMA due to a material breach by CEA, effectively allowing 10X to unilaterally force the windfall payment obligation. AMA § 13(a). On the Complaint's figures, the remaining fee stream approaches $100 million based on the current value of the treasury assets—nearly 90% of CEA's market capitalization and almost 30% of the BNB treasury. Compl. ¶ 8.

***10X Collected Millions Without Performing the Core Services It Promised.*** 10X agreed to act as a fiduciary and manage purchases, sales, staking, and other transactions to earn rewards and yield on CEA's treasury assets. Compl. ¶ 3. CEA alleges that 10X instead performed no active trading or rebalancing and functioned mainly as an advisor, a role for which it had already received warrants under a separate agreement. *Id.* ¶¶ 4, 23, 35. Even though 10X did not provide the core services described in the AMA, from August 2025

through April 2026, CEA paid 10X approximately $4.65 million total in monthly asset management fees. *Id.* ¶¶ 4, 36.

***CEA Proposed Market-Based Amendments; 10X Refused.*** After the existence of the YZi Labs side agreement surfaced, CEA's independent directors obtained a benchmark analysis of the economic and other terms of the AMA against other publicly listed digital asset treasury companies. The AMA was "on the extreme end" of agreements among surveyed companies. Compl. ¶¶ 29-30. It was plainly beyond the pale. CEA proposed amendments to the AMA. *Id.* ¶ 31. In response, 10X stalled and its appointed director, Hans Thomas, resigned so that all negotiations around the AMA "could take place at a fully arm's-length basis." Later, and after weeks of claiming that they had hired their own third-party vendor to conduct a detailed benchmarking exercise, 10X responded with an email containing only "cursory" and "self-interested" benchmark metrics. *Id*. ¶¶ 32-33. 10X continues to maintain that any termination triggers the "liquidated damages" penalty provision, precluding CEA from terminating the AMA and hindering its ability to protect shareholder value. *Id*. ¶¶ 34, 37, 41, 51.

## LEGAL STANDARD

On a motion to dismiss, the Court accepts well-pleaded allegations as true and draws all reasonable inferences in CEA's favor. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786-87, 790-91 (3d Cir. 2016). The inquiry is confined to the pleaded facts; the Court does not weigh evidence, resolve disputed facts, or draw inferences for the movant. *See BitGo Holdings, Inc. v. Galaxy Digit. Holdings, Ltd.*, 319 A.3d 310, 322 (Del. 2024). CEA's Complaint need only provide "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a contractual provision is susceptible to more than one reasonable reading, the Court

may not choose between the competing readings on the pleadings, much less adopt the movant's reading over CEA's. *BitGo Holdings*, 319 A.3d at 323 (citing *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)).

## ARGUMENT

### I. CEA's Unconscionability Claim Is Well Pleaded.

Resolution of unconscionability is generally not appropriate at the pleadings stage. In any event, Delaware requires both procedural and substantive unconscionability, but the two are assessed on a sliding scale under which, "if more of one is present, then less of the other is required." *James v. Nat'l Fin., LLC*, 132 A.3d 799, 815 (Del. Ch. 2016) (rescinding a $200 payday loan carrying an 838% effective rate) (citation omitted). Dismissal is unwarranted here because CEA pleads a coercive process that resulted in an oppressive bargain.

#### A. Dismissal of These Claims Is Not Appropriate at This Stage.

As an initial matter, Delaware courts routinely decline to resolve whether an agreement is unconscionable at the pleading stage. *See Bochniak v. Blenheim at Bay Pointe, LLC*, 2011 WL 2184180, at *6 (Del. Super. Ct. May 31, 2011) (unconscionability must "be fleshed out in the context of a developed factual record"); *Andor Pharms., LLC v. Lannett Co.*, 2024 WL 1855112, at *17 (Del. Super. Ct. Apr. 29, 2024) (denying motion to dismiss sophisticated corporation's unconscionability counterclaim based on alleged concealed information); *Johnson v. Tele-Cash, Inc.*, 82 F. Supp. 2d 264, 278-79 (D. Del. 1999) (declining, "given the present record," to find terms not "so one-sided as to be oppressive") (citation omitted); *see also In re Elkins-Dell Mfg. Co.*, 253 F. Supp. 864, 873-74 (E.D. Pa. 1966) (vacating an unconscionability ruling and remanding for a factual hearing). Here, the Motion itself shows why. Rather than arguing as a matter of law, 10X

simply challenges the facts. It does not accept the Complaint's (irrefutable) allegations that the AMA was imposed on a 72-hour take-it-or-leave-it basis, that 10X threatened to terminate the already-signed PIPE, or that 10X concealed a side agreement altering the AMA's economics. It instead asks the Court to accept that the AMA was "heavily negotiated," "arm's-length," and the product of meaningful choice. Mot. at 1, 8-9. But CEA alleges the opposite. Compl. ¶¶ 6, 18-23, 57.

**B. The AMA Is Procedurally Unconscionable.**

Delaware courts assess "procedural unconscionability" by reference to four of the ten *Fritz* factors, none of which are individually dispositive. These factors include: (i) "[i]nequality of bargaining or economic power"; (ii) exploitation of the "underprivileged, unsophisticated, uneducated, and illiterate"; (iii) "boilerplate contracts" drafted "by the party in the strongest economic position . . . and offered on a take it or leave it basis"; and (iv) "the circumstances surrounding the execution of the contract, including commercial setting, its purpose, and actual effect[.]" *James*, 132 A.3d at 826. CEA's allegations satisfy several factors.

*First*, the "circumstances surrounding the execution" of the AMA show that CEA could not exercise a meaningful choice. At the eleventh hour, 10X presented a one-sided AMA and gave CEA's Board 72 hours to accept every term or forfeit the $500 million PIPE. Compl. ¶¶ 6, 21; *see* AMA § 13(a). That leverage was secretly manufactured. 10X had already been well compensated for its role in the PIPE under the separately executed Securities Purchase and Advisor Agreements. Compl. ¶¶ 20, 23. Yet 10X used the PIPE's closing to obtain additional, separate long-term compensation in the form of the AMA. Delaware courts sustain duress and rescission claims on materially similar allegations. *See Hopewell Logistics, Inc. v. Boomi, L.P.*, 2026 WL 2111406, at *1, *5 (Del. Super. Ct.

June 30, 2026) (economic duress claim adequately pleaded where, "just before the previous agreement was set to expire," the counterparty demanded fees "neither contracted for nor owed"); *Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *17 (Del. Ch. Oct. 10, 2006) (threat of litigation and termination "sufficiently pled" element of economic duress).

10X's deception compounded its coercion. A party cannot meaningfully assent where the economics are hidden; the presence of "elements of deception" is a hallmark of procedural unconscionability. *See In re AZEK Bldg. Prods., Inc., Mktg. & Sales Pracs. Litig.*, 82 F. Supp. 3d 608, 616-17 (D.N.J. 2015) (applying Restatement (Second) of Contracts § 208 cmt. d—the provision the Delaware court follows in *James*—and holding that a transaction "involv[ing] elements of deception" contributes "to a finding of unconscionability in the bargaining process," which "should but rarely be determined on the bare-bones pleadings") (citations omitted). 10X entered an undisclosed side agreement giving 20% of AMA fees to YZi Labs while assuring CEA that the AMA was "solely between CEA and 10X." Compl. ¶¶ 22, 26. CEA understood the fee to represent a monthly asset management fee for 10X's expected significant treasury asset management services—not that 20% was pre-committed to YZi Labs for no consideration to CEA whatsoever. *Id.* ¶ 40. CEA therefore alleges far more than a "dispute over price." *Andor*, 2024 WL 1855112, at *17 (citation omitted). 10X's refrain that unconscionability "is determined at the time it was made" (Mot. at 8) does not narrow the Complaint. The concealed agreement with YZi Labs predated the AMA and, as alleged, already constrained any ability CEA had to negotiate. Compl. ¶ 26.

*Second*, CEA adequately alleges "[i]nequality of bargaining or economic power." *James*, 132 A.3d at 826. The question is whether "the party with superior bargaining power used it to take unfair advantage of [its] weaker counterpart." *Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 624 (Del. 2023) (citation omitted). The Complaint alleges exactly that: 10X controlled the $500 million PIPE. CEA was a Nasdaq-listed micro-cap environment-agriculture and vape company with no finance operations. 10X enticed CEA, signed the PIPE with it, and demanded it then execute the AMA without a single word of amendment possible in order to actually receive the PIPE funds. Compl. ¶¶ 2, 18-19, 21.

*Third*, the AMA is a contract of adhesion. 10X, "the party in the strongest economic position," drafted the AMA and "offered [it] on a take it or leave it basis." *James*, 132 A.3d at 826. That adhesive character "makes it relatively more likely that the agreement will be found unconscionable." *Id.* at 832. Moreover, 10X imposed an expiring 72-hour "take it or leave it" offer and "refused to negotiate over any of its terms." Compl. ¶¶ 6, 21, 57.

CEA's public-company status and 72 hours of representation by counsel around the AMA do not foreclose the claim. CEA's experience in controlled-environment agriculture does not bear on its capacity to evaluate a 20-year digital asset management agreement delivered on 72 hours' notice following the execution of a $500 million PIPE. Moreover, sophistication, resources, and presence of counsel are relevant but "not dispositive." *Unbound Partners Ltd. P'ship v. Invoy Holdings, Inc.*, 251 A.3d 1016, 1036 (Del. Super. Ct. 2021). There is "no corporate exemption," and the presence of counsel "may not carry the day." *Id.* Delaware and other courts in this Circuit let sophisticated parties represented by counsel pursue unconscionability past the pleadings. *See Andor*, 2024 WL 1855112, at *17 (sustaining a sophisticated corporation's unconscionability counterclaim); *Unbound*,

251 A.3d at 1037 (declining to dismiss a challenge by a fund and its portfolio company, both represented by counsel).

10X's cited authorities do not hold otherwise. Each turned on genuine bargaining or a walk-away option that CEA lacked. *Ketler v. PFPA, LLC* found "[t]here is no deprivation of meaningful choice if a party can walk away from the contract," 132 A.3d 746, 748 (Del. 2016), and *Talkdesk, Inc. v. DM Trans, LLC* turned on a three-month negotiation process, 2024 WL 2799307, at *9 (Del. Super. Ct. May 31, 2024). 10X's remaining authorities are no different—each involved real negotiation, a competitive process, or a developed record absent here. *See FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842, 862 (Del. Ch. 2016); *Rummel Klepper & Kahl, LLP v. Del. River & Bay Auth.*, 2022 WL 29831, at *14 (Del. Ch. Jan. 3, 2022); *Waters v. Del. Moving & Storage, Inc.*, 300 A.3d 1, 26-28 (Del. Super. Ct. 2023); *Terrell*, 297 A.3d at 624; *Reserves Mgmt., LLC v. Am. Acq. Prop. I, LLC*, 2014 WL 823407, at *9 (Del. 2014). CEA alleges the opposite: a single drafter, a nonnegotiable take it or leave it AMA, a 72-hour deadline, and rejection, all tied to rescission of a half-billion-dollar capital raise that CEA had come to reasonably rely on. Compl. ¶¶ 6, 21, 57.

### C. The Onerous Terms of the AMA Are More Than Sufficient to Plead Substantive Unconscionability.

Delaware courts typically assess substantive unconscionability by balancing six of the ten *Fritz* factors: (i) a "significant cost-price disparity or excessive price"; (ii) the "denial of basic rights and remedies"; (iii) "[p]enalty clauses"; (iv) concealment of disadvantageous clauses; (v) incomprehensible drafting; and (vi) an "overall imbalance in the obligations and rights imposed by the bargain." *James*, 132 A.3d at 815-16. At a minimum, CEA alleges facts satisfying each of the first, second, third, and sixth factors.

**1. 10X's Management Fees Are Excessively Priced.**

The first factor asks whether there is a "significant cost-price disparity or excessive price." *James*, 132 A.3d at 815. Courts examine both: (1) whether the price is fundamentally unfair in absolute terms; and (2) whether it compares favorably to market benchmarks. *See id.* at 817-19 (finding a loan with 838.45% APR fundamentally unfair despite expert testimony that such a rate could result from a competitive market).

The AMA contains excessive pricing on both measures. Under the AMA, CEA pays 10X 1.75% of its treasury assets, "earned daily" and billed monthly—roughly $400,000 to $690,000 each month between August 2025 and April 2026 based on the value of the treasury assets—even though 10X "performed no active trading or rebalancing of CEA's treasury." Compl. ¶¶ 25, 35-36; *see* AMA § 6(a) & Sch. C. The disparity is between price and value: CEA pays a fee calculated on the full value of the treasury while, as alleged, receiving none of the active management that fee was meant to buy. *See* Compl. ¶ 35. Indeed, 10X has allowed the BNB to sit in a custodial wallet without any active management. Compl. ¶ 4. CEA's benchmarking likewise places the AMA "on the extreme end" of benchmarking against other asset management agreements. *Id.* ¶ 30. Fact and expert discovery will reveal precisely how excessive the fee here is.

**2. The AMA Denies CEA Basic Rights and Remedies.**

The next factor asks whether the agreement denies "basic rights and remedies." *James*, 132 A.3d at 815. The AMA deprives CEA of two basic rights. *First*, CEA lacks any authority to oversee 10X's performance or terminate 10X without incurring financially fatal liabilities. 10X holds an irrevocable power of attorney over CEA's entire treasury through the 20-year term. Compl. ¶ 50; *see* AMA §§ 3(a)-(b), 13(a). Oversight by CEA's "Strategic Committee" is illusory by design. 10X's own principals sat on the Strategic



71778/0001-53892601

Committee when it was first constituted and could veto any adverse determination. Compl. ¶¶ 27, 46; *see* AMA §§ 8(b), 13(b).[4] Moreover, "only the Strategic Committee, acting by unanimous consent, shall be approved to initiate the Treasury Strategy and access the Treasury Assets"—so CEA could not reach its own half-billion-dollar treasury without 10X's consent. AMA § 8(b)(ii).

While Delaware has not squarely addressed such provisions, persuasive authority has held a similar agreement to be substantively unconscionable. *See Simon v. Smith*, 273 A.3d 321, 332-33 (D.C. 2022) (holding unconscionable a 20-year term, authority to manage and encumber property "with no control or oversight," and "irrevocable power of attorney"). Delaware should reach the same outcome as its courts construe irrevocable proxies narrowly and find restraints on termination to be unconscionable. *Daniel v. Hawkins*, 289 A.3d 631, 645, 648-49 (Del. 2023) (any ambiguity in an irrevocable proxy is "construed against the rights of the proxy holder"); *Stewart v. Stewart*, 41 A.3d 401, 405 (Del. 2012) (lifetime alimony "with no modification or termination clause" was unconscionable).

*Second*, the AMA strips CEA's remedies while asymmetrically preserving 10X's. CEA cannot recover consequential, indirect, or lost-profit damages for 10X's breaches, but no comparable restriction applies to any liability by CEA. Compl. ¶ 56; *see* AMA § 11(b); *cf.* AMA §§ 13(e), 16(i). 10X, by contrast, may recover "direct, indirect, special, consequential, speculative and punitive damages, as well as lost future profits" after a

---

[4] 10X argues that the Committee could "add up to three additional members" (Mot. at 12), but the provision it cites vests that power in "the Strategic Committee, acting by unanimous consent." Yet, at formation, that Committee consisted entirely of two 10X principals. AMA § 8(b)(iii).

termination for Cause. AMA §§ 11(a), (c)-(d), 13(e). The asymmetry runs deeper. Section 11(a) exculpates 10X—which agreed to act as CEA's fiduciary, Compl. ¶ 3—from all liability short of gross negligence or willful misconduct. Sections 11(c) and (d) require CEA to indemnify and advance 10X for losses even if arising from 10X's negligence. Such asymmetry supports substantive unconscionability. *See, e.g.*, *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 267-68 (3d Cir. 2003) (employee-only damages restriction was unconscionable where the employer did not accept a comparable limit).

The authorities 10X cites do not address asymmetrical provisions. *See Chatham Fin. Corp. v. Milhaus, LLC*, 807 F. Supp. 3d 373, 390-91 (D. Del. 2025) (clause capped liability of "either party"); *AcademixDirect, Inc. v. Digit. Media Sols., LLC*, 2020 WL 3868302, at *1-2 (Del. Super. Ct. June 26, 2020) ("neither party" liable for consequential damages or lost profits under provision); *JJCK, LLC v. Project Lifesaver Int'l*, 2011 WL 2610371, at *4 (D. Del. July 1, 2011) (mutual clause whose validity the challenger conceded). Here, the limitations on liability are asymmetrical and contested.

**3. The AMA Contains an Arbitrary Penalty Provision.**

A penalty clause is itself a factor supporting unconscionability. *James*, 132 A.3d at 815-16. As shown in Part II.B below, Section 13(a) is an unenforceable penalty provision.

**4. The AMA Reflects an Overall Imbalance in the Bargain.**

The final *Fritz* factor "examines the agreement as a whole." *James*, 132 A.3d at 816, 822. The terms addressed above—the 20-year term with exorbitant fees for minimal services, irrevocable power of attorney, the initially self-policing Strategic Committee, the one-sided remedies bar, and the exit penalty—do not stand in isolation; together they strip CEA of value, control, and any means of exit, an imbalance greater than any single term. Compl. ¶¶ 25, 27, 38-46, 50, 56; *see* AMA §§ 3(b), 6(a), 8(b), 11(b), 13(a)-(b).

## II. CEA's "Liquidated Damages" Claim Is Ripe and Well Pleaded.

10X challenges both the ripeness and merits of CEA's declaratory judgment claim (Count II). Neither argument passes muster.

### A. The Declaratory Judgment Claim Is Ripe.

10X's ripeness challenge fails because the Complaint pleads an immediate controversy over the enforceability of Section 13(a). Compl. ¶¶ 8, 37, 40, 60-71. Declaratory claims presenting "predominantly legal questions" are "generally amenable to a conclusive determination in a preenforcement context," and are ripe where the counterparty has refused to honor the disputed obligation even though no payment has yet come due. *Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Loc. Union No. 66*, 580 F.3d 185, 191-92 (3d Cir. 2009). Ripeness turns on "the adversity of the parties' interests, the conclusiveness of the judgment, and the practical utility of that judgment." *Wayne Land & Min. Grp. LLC v. Del. River Basin Comm'n*, 894 F.3d 509, 522 (3d Cir. 2018). 10X contests only adversity. Mot. at 17-18.

CEA's and 10X's interests are adverse and "harm will result if the declaratory judgment is not entered." *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995). CEA may bring a declaratory-judgment claim based on the threat of future harm where "the probability of that future event occurring is real and substantial, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* Although 10X claims that "no liquidated damages obligation has arisen" (Mot. at 18), its own interpretation of Section 13(a) and refusal to replace the unenforceable term effectively eliminates CEA's ability to exercise its contractual right to terminate the oppressive AMA. If CEA were to terminate the AMA, it would immediately and irrevocably be obligated to continue paying 10X for the 19 years remaining in the 20-year term—in exchange for no

further performance. Compl. ¶¶ 8, 33-34. Indeed, the provision "hinders CEA's ability to protect its value for its shareholders." *Id.* ¶ 34. The dispute over that deterrent effect is what makes the dispute ripe. *See Surrick v. Killion*, 449 F.3d 520, 527-28 (3d Cir. 2006) (claim ripe where fear of sanctions deterred plaintiff from acting, though no enforcement was threatened); *Bradfield v. Heartland Payment Sys., LLC*, 2018 WL 5784998, at *6 (D.N.J. Nov. 5, 2018) (claim stated where defendant had "not expressly disavowed" enforcement); *Wayne Land & Min. Grp. LLC*, 894 F.3d at 523 (adversity alleged where plaintiff faced expensive jurisdictional determination or fines).

10X's own authorities confirm ripeness. *Pittsburgh Mack* (Mot. at 17) held that "a plaintiff need not suffer a *completed* harm" and must only demonstrate "that the probability of that future event occurring is real and substantial[.]" 580 F.3d at 190 (citation omitted). The Court in *Pittsburgh Mack* confirmed ripeness on materially similar facts. *See* 580 F.3d at 191-92 (holding that declaratory action over contractual dispute was ripe where the counterparty "explicitly refused" to honor the obligation that Plaintiff disputed even though no payment had yet come due). Likewise, *Pai v. DRX Urgent Care, LLC*, 2014 WL 837158 (D.N.J. Mar. 4, 2014) (Mot. at 18) is distinguishable. In that case, the plaintiff sought a declaratory judgment that a restrictive covenant was unenforceable but alleged no plan to compete. *Id.* at *11. Here, CEA alleges that it is prevented from terminating the AMA. Compl. ¶¶ 4, 8, 27, 34-35. Moreover, 10X has not disavowed enforcement of Section 13(a) upon termination. *See Bradfield*, 2018 WL 5784998, at *6 (claim ripe where defendant had "not expressly disavowed" enforcement of restrictive covenant).

**B. Section 13(a) Is an Unenforceable Penalty.**

Although labeled "liquidated damages," as the Complaint shows, Section 13(a) is an unenforceable penalty. Delaware courts only enforce liquidated damages where (1) the

damages are uncertain at the time of contracting, and (2) the stipulated sum reasonably estimates anticipated loss or is reasonably proportionate to actual loss. *Dow Chem. Can. Inc. v. HRD Corp.*, 909 F. Supp. 2d 350, 356, 358 (D. Del. 2012). If either criterion is not met, "the provision is void as a penalty." *Wilmington Hous. Auth. v. Pan Builders, Inc.*, 665 F. Supp. 351, 353-54 (D. Del. 1987). Section 13(a) fails the second requirement.

Section 13(a) is not a "reasonable estimate" of 10X's anticipated loss. Indeed, it is not an estimate at all. 10X contends that its fees are to be paid monthly per the contractual formula after its termination. Mot. at 11. That formula is based on the fluctuating daily value of CEA's treasury (which in turn is based on the volatile crypto market) through the year 2045. AMA § 6(a); Sch. C. Section 13(a)'s failure to establish a "certain and definite damages" amount is itself fatal to the provision and is entirely contrary to the very purpose of liquidated damages. *Unbound*, 251 A.3d at 1032 (liquidated damages provisions "serve to make certain and definite damages which would otherwise be uncertain and not susceptible of proof.") (quoting *Del. Bay Surgical Servs., P.C. v. Swier*, 900 A.2d 646, 650 (Del. 2006)); *Marino v. Cross Country Bank*, 2007 WL 1810485, at *2 (D. Del. June 25, 2007) ("It is generally accepted that parties to a contract may agree ***on a fixed sum*** to be paid as liquidated damages to compensate the non-breaching party in the event of breach") (emphasis added).[5] Here, by contrast, under 10X's reading (Mot. at 11), Section 13(a) simply requires that CEA continue to pay (with no effort to stipulate any amount and for no services in return) through 2045. Under any reading, it is an unenforceable penalty.

[5] Liquidated damages cases cited by 10X likewise involve stipulated sums certain. *See, e.g.*, *Brazen v. Bell Atl. Corp.*, 695 A.2d 43, 47-48 (Del. 1997) (stipulated damages of $550 million); *Del. Bay Surgical Servs., P.C.*, 900 A.2d at 649 (stipulated damages of $25,000).

Moreover, far from an effort to "reasonably estimate" 10X's prospective harm, the payment requirement is itself absurd on its face. The total amount could be $100 million over the next 19 years (based on the current value of treasury assets). Moreover, the amount is based on the fluctuating daily value of the CEA treasury through 2045, which consists of BNB tokens—a token that itself is only nine years old and part of the notoriously volatile crypto market. In addition, the provision fails to subtract fees 10X did not expect to receive, *e.g.*, fees it shared with YZi Labs. Nor does it subtract costs that 10X will avoid by ceasing its performance under the AMA. Section 13(a) merely serves as an economic barrier to CEA's exercise of its termination rights. *See Tekstrom, Inc. v. Savla*, 2006 WL 2338050, at *6 (Del. Super. Ct. July 31, 2006) (early-termination charge was a penalty where the obligor "would have had to pay the . . . penalty whether he was working for one day or eighteen months"); *Tropical Nursing, Inc. v. Ingleside Homes, Inc.*, 2006 WL 3579075, at *3 (Del. Super. Ct. Dec. 11, 2006) (a fee that "serve[s] as an economic incentive not to breach, rather than a measure of compensation," is "void"). The provision also effectively prevents CEA from engaging in future fundraising efforts. If CEA were to raise additional capital, it would go into its treasury and 10X's management fees would grow proportionally (like a tax on new money), while 10X does nothing. *See* AMA § 2(b)(y).

Similarly, Section 13(a) is speculative in its term. 10X could not reasonably expect to receive the remaining 19 years of fees from a company that only just entered the (volatile) digital asset treasury business in August 2025. Delaware law does not permit expectation damages founded on speculation. For example, in *BTG Int'l, Inc. v. Wellstat Therapeutics Corp.*, the Court of Chancery refused to calculate damages based on an assumption that the project would be renewed eight years into the future because doing so

would be an "educated guess" and the existing ten-year model was already "assumption-laden." 2017 WL 4151172, at *20 (Del. Ch. Sept. 19, 2017).

10X aims to avoid judicial scrutiny by arguing that AMA recitals—*i.e.*, that Section 13(a) is "not a penalty"—are controlling. Mot. at 10; AMA § 13(a). But Delaware law treats contractual labels as "merely one factor," not as dispositive of whether a provision is an unenforceable penalty. *Del. Bay Surgical Servs., P.C.*, 900 A.2d at 650 n.3. 10X's cited cases confirm the same. In *Brazen*, the court assessed whether a merger termination fee should be reviewed as a deal-protection measure under the business-judgment rule or as a liquidated-damages provision. 695 A.2d at 47-48. The Court cited the parties' description of the fee as "liquidated damages and not a penalty" only to determine that the liquidated-damages framework applied. *Id.* at 47 (citation omitted). It then independently examined whether that provision was unenforceable as a penalty. *Id.* at 48-50. *Meritage Fund LLC v. Bohoho Grp., LLC* followed the same approach. 2025 WL 3854813, at *8 (Del. Super. Ct. Dec. 8, 2025). *Standard Gen. L.P. v. Charney* is even further removed: it applied New York law and involved repayment of loan principal already advanced, plus interest—not future gross compensation for unperformed services. 2017 WL 6498063, at *4, *24 (Del. Ch. Dec. 19, 2017). Section 13(a)'s self-characterization does not control.

## CONCLUSION

For the foregoing reasons, the Court should deny 10X's Motion in its entirety.[6]

---

[6] In the alternative, CEA should be granted leave to replead. Leave to amend must be "freely give[n] . . . when justice so requires," Fed. R. Civ. P. 15(a)(2), and 10X has not shown that amendment would be futile. Its futility argument (Mot. at 20) identifies no defect that repleading could not cure. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

**OF COUNSEL:**

**BROWN RUDNICK LLP**
Stephen D. Palley (admitted *pro hac vice*)
Brown Rudnick LLP
601 Thirteenth Street NW Suite 600
Washington, D.C. 20005
(202) 536-1766 (Phone)
spalley@brownrudnick.com

Michael S. Winograd (admitted *pro hac vice*)
Hayden A. Miller (admitted *pro hac vice*)
Matthew M. Jang (*pro hac vice* forthcoming)
Brown Rudnick LLP
7 Times Square
New York, NY 10036
(212) 209-4800 (Phone)
mwinograd@brownrudnick.com
hmiller@brownrudnick.com
mjang@brownrudnick.com

Johanna P. Fay (admitted *pro hac vice*)
Brown Rudnick LLP
One Financial Center
Boston, MA 02111
(617) 856-8200 (Phone)
jfay@brownrudnick.com

**COLE SCHOTZ P.C.**

*/s/ James S. Green, Jr.*
Andrew L. Cole (No. 5712)
James S. Green, Jr. (No. 4406)
Nathaniel J. Klepser (No. 6975)
500 Delaware Avenue, Suite 600
Wilmington, DE 19801
(302) 652-3131 (Phone)
(302) 652-3117 (Fax)
acole@coleschotz.com
jgreen@coleschotz.com
nklepser@coleschotz.com

*Attorneys for Plaintiff,*
*CEA Industries, Inc.*

Dated: August 14, 2026